ALFRED S. JOHNSON, Respondent, v. UNION PACIFIC RAILROAD COMPANY, a Corporation, Appellant.

No. 1973. Decided March 13, 1909 (100 Pac. 390).

1. EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY. Photographs of persons, objects, or localities, which are subject-matters of inquiry, are admissible to aid in applying the facts proved.[1] (Page 294.)

2. CARRIERS—INJURIES TO PASSENGERS—ADMISSIBILITY OF EVIDENCE —CONDITIONS AFTER ACCIDENT. Photographs of a railroad wreck, taken an hour after the occurrence, which show the derailed cars, the track, and grade, and a pile of broken ties on the side of the railroad grade where the accident occurred, are admissible, in an action by a passenger for injuries, as against the objection that they were taken after changes had been made, by reason of workmen piling the broken ties taken from the wreck and broken and torn loose from the roadbed by the derailed cars. (Page 295.)

3. APPEAL AND ERROR—HARMLESS ERROR—ERRONEOUS ADMISSION OF EVIDENCE. Where, in an action for injuries to a passenger by the derailment of cars, witnesses testified to the condition of the track, and showed that it was torn up, and that the ties were broken and bunched, the error, if any, in admitting in evidence photographs illustrating the conditions was harmless. (Page 295.)

4. EVIDENCE—OPINION EVIDENCE—COMPETENCY OF WITNESSES. A nonexpert is competent to testify as to whether a person with whom he is acquainted, and whose appearance and conduct he has

[1] Dederichs v. S. L. Ry. Co., 14 Utah 137, 46 Pac. 656, 35 L. R. A. 802; State v. McCoy, 15 Utah 136, 49 Pac. 420.

observed, is in good or bad health, or has a strong or weak voice, and may compare the condition of such person before and after an accident resulting in a personal injury. (Page 296.)

5. APPEAL AND ERROR—HARMLESS ERROR—ERRONEOUS ADMISSION OF EVIDENCE. Where a non-expert witness details the facts on which he bases his opinion, the error, if any, in admitting his opinion is usually harmless especially where the evidence shows that the jury must have reached the same conclusion as the witness.[2] (Page 296.)

6. EVIDENCE—OPINION EVIDENCE—SPEED OF TRAIN—WEIGHT OF EVIDENCE. A person of average intelligence, who has observed a moving train on a given occasion, may give his opinion as to its speed, but the weight of his opinion depends on his intelligence, learning, experience, and the degree of attention he gave the matter.[3] (Page 297.)

7. APPEAL AND ERROR—HARMLESS ERROR—ERRONEOUS ADMISSION OF EVIDENCE. Where witnesses without objection testified that the speed of a train was between forty and fifty miles an hour, the error, if any, in admitting the testimony of another witness testifying that the speed of the train was from forty-five to fifty miles was harmless.[4] (Page 297.)

8. APPEAL AND ERROR—HARMLESS ERROR—ERRONEOUS ADMISSION OF EVIDENCE. Where there was no substantial conflict in the evidence as to the speed of a train, the error, if any, in admitting non-expert witnesses to testify as to its speed was harmless. (Page 298.)

9. EVIDENCE—BEST AND SFCONDARY EVIDENCE—COLLATERAL WRITINGS. The rule that before parol evidence of the contents of a written instrument can be received, it must be shown that the instrument is lost, or under the control of the adverse party, who refuses on demand to produce the instrument, does not apply where the instrument is not in issue, but merely collateral to it, in which case parol evidence may be given, though the written instrument is obtainable. (Page 299.)

10. EVIDENCE—BEST AND SECONDARY EVIDENCE—COLLATERAL WRITINGS. In an action for injuries to a passenger by the derailment of cars, a section foreman may testify that he obtained information respecting the speed limit of trains over the par-

[2] Davis v. O. S. L. R. Co., 31 Utah 307, 88 Pac. 2.
[3] Chipman v. Union Pac. R. Co., 12 Utah 68, 41 Pac. 562.
[4] Chipman v. Union Pac. R. Co., 12 Utah 68, 41 Pac. 562.

ticular part of the road where the accident occurred, in a letter written to him by his superior officer, as against the objection that his parol testimony is not the best evidence. (Page 299.)

11. EVIDENCE—BEST AND SECONDARY EVIDENCE—WRITING WITHOUT THE STATE. Where a written instrument admissible in evidence is traced to the hands of one not within the State, secondary evidence, without further showing, is admissible to prove the contents thereof.[5] (Page 300.)

12. CARRIERS—INJURIES TO PASSENGERS—EVIDENCE—ADMISSIBILITY. In an action for injuries to a passenger by the derailment of cars, the testimony of a section foreman in charge of the portion of the road where the accident occurred that he had been, for several days before the accident, engaged in repairing the road at that point, and that the speed limit of trains over that portion of the road was fifteen miles an hour, was admissible to show that the officers and agents of the carrier had notice of the unsafe condition of the road, and that it was unsafe to operate trains over it at a greater rate of speed than fifteen miles per hour. (Page 301.)

13. TRIAL—ARGUMENT OF COUNSEL. Where, in an action for injuries to a passenger by the derailment of cars, the carrier showed that it had settled with most of the persons injured in the wreck, and that it settled ninety-nine cases out of one hundred where a reasonable settlement could be made, the argument of plaintiff's counsel that the settlements made by the carrier showed an admission of its liability for the damage done by the wreck was not improper. (Page 303.)

14. APPEAL AND ERROR—OBJECTIONS IN TRIAL COURT—IMPROPER ARGUMENT OF COUNSEL. A party, to avail himself on appeal of the misconduct of opposing counsel in the argument of a case, must make a seasonable objection, and give the trial court an opportunity to remove any prejudicial effect by admonishing the offending counsel, or by instructing the jury to disregard the objectionable remarks.[6] (Page 303.)

15. APPEAL AND ERROR—OBJECTIONS IN TRIAL COURT—IMPROPER ARGUMENT OF COUNSEL—"EXCEPTION." Under Comp. Laws 1907, secs. 3282, 3283, 3304, defining an "exception" as an objection on a matter of law, etc., and providing that on appeal all rulings to which exceptions have been taken are reviewable, misconduct of counsel in making improper remarks to the jury

---

[5] Dwyer v. Salt Lake City, 14 Utah 339, 47 Pac. 311; McCollom v. Southern Pac. Co., 31 Utah 494, 88 Pac. 663.

[6] State v. Spencer, 15 Utah 149, 49 Pac. 302.

in his argument, to which no objection was made, nor any request for an instruction to the jury on the subject, is not reviewable. (Page 304.)

16. DAMAGES—PERSONAL INJURIES—EXCESSIVE DAMAGES. A lawyer, thirty-nine years old, with an income from his practice of from $7,500 to $9,500 per year, was injured in a railroad wreck. He sustained. a. physical collapse due to loss of blood from injuries and shock. He received a cut in the throat and bruises on his body. For a few months after the accident he had great difficulty in swallowing food and in speaking, due to paralysis arising from the cut of the throat. His injury to the throat was permanent. His income from his profession declined, in consequence of his injuries, to from $4,300 to 5,700 per year. *Held,* that a verdict for $16,500 was not excessive. (Page 305.)

APPEAL from the Third District Court, Salt Lake County.—*Hon. T. D. Lewis,* Judge.

Action to recover damages for personal injuries received by plaintiff while a passenger on defendant's train. From a judgment for plaintiff, the defendant appealed.

AFFIRMED.

*P. L. Williams, G. H. Smith* and *John G. Willis* for appellant.

*Messrs. Booth, Lee & Badger* for respondent.

APPELLANT'S AUTHORITIES.

The court erred in permitting evidence of non-experts as to the plaintiff's condition. (*Myers v. Mining Co.,* 28 Utah 96; *Black v. Telephone Co.,* 26 Utah 451; *Jensen v. McCormick,* 26 Utah 142; *Nichols v. Railroad,* 25 Utah 240; *Stoll v. Mining Co.,* 19 Utah 271; *Wooley v. Maynes-Wells Company,* 18 Utah 232; *Reese v. Mining Co.,* 17 Utah 489; *Saunders v. Southern Pacific Company,* 15 Utah 334; *Hamer v. Bank,* 9 Utah 215; *Forwarding Company v. Insurance Co.,* 8 Utah 41; 16 Cyc., pp. 25 and 26.)

Persons qualified by experience with reference to rail-

road matters, are held to be competent to testify as experts to the cause of an accident and whether it could have been prevented or not. (17 Cyc. 240; *Brownfield v. Railway* 107 Iowa 245, 77 N. W. 1038; *Seaver v. Railroad,* 14 Gray 466; *Railroad v. Thompson,* 75 Texas 501, 12 S. W. 742; *Railroad v. Sherman,* 53 S. W. 386; *Donahoe v. Railroad,* 159 Mass. 125, 34 N. E. 87; *McCray v. Railroad,* 89 Tex. 168, 34 S. W. 95; *Railroad v. Craig,* 53 N. E. 1033; *Railroad v. Croskell,* 25 S. W. 486; *Railroad v. Watson,* 190 U. S. 287; 1 Wigmore on Evidence, chap. 22, secs. 555 to 571.)

## STATEMENT OF FACTS.

Alfred S. Johnson brought this action to recover damages for personal injuries received by him while traveling as a passenger on defendant's line of railroad between Denver, Colo., and Kansas City, Mo. It is alleged in the complaint that defendant was negligent in failing to exercise reasonable care in inspecting, propelling, and handling the car in which plaintiff was riding as a passenger; that it failed to exercise reasonable care in maintaining and inspecting the track, rails, ties, and roadbed of its said line of railway, and carelessly and negligently permitted its said track, rails, ties, and roadbed to be out of repair, and to be in an unsafe condition; that defendant carelessly and negligently propelled and handled the car in which plaintiff was a passenger at a dangerous and unsafe rate of speed, and that by reason of the aforesaid carelessness and negligence said car was derailed and thrown from the track and roadbed and rolled down an embankment, throwing plaintiff violently about in said car, "so that he was greatly and permanently injured, hurt, cut, bruised, wounded, and injured in his face, neck, throat, chest, limbs, and other portions of his body; . . . that in consequence of said injuries he became, and was, and is, sick, sore, and lame and disordered and per-

manently injured, and suffered great and permanent pain
and agony in body and mind, and a severe and permanent
injury of his voice and vocal organs." The defendant an-
swered, denying generally the foregoing allegations of neg-
ligence. A trial was had, which resulted in a verdict in
favor of plaintiff in the sum of $16,500. To reverse the
judgment rendered on the verdict defendant prosecutes this
appeal.

The facts disclosed by the record are about as follows:
Plaintiff is an attorney at law of Providence, R. I. At the
time of the accident complained of he was thirty-nine years
of age, and for about twelve years prior thereto had been
actively engaged in the practice of law. On August 20th,
1904, he, in company with about fifty-six other persons,
started on a trip (excursion) to San Francisco and return.
This party traveled in two Pullman cars, which had been
furnished them for their occupancy on the entire journey.
They were on their return trip, traveling between Denver
and Kansas City, September 19th, 1904, when the accident
complained of occurred. The plaintiff was at that time
seated with others in the smoking compartment of the car
Kara, engaged in a game of cards. This car was the last or
rear car in the train. Immediately in front of the Kara
was the car Polynesia, and the Amsterdam was in front of,
and next to, the Polynesia. At a place some five or six miles
west of Junction City, Kan., the hind wheels of the rear
truck of the Amsterdam left the track, and immediately
thereafter the Polynesia and Kara were completely derailed.
From the point where the cars left the track "eastward
[quoting from appellant's statement of the case] for a short
distance there were flange marks on the ties, some of which
were cut clear through and broken off. Then for a distance
of some two hundred feet or more the track was all torn
to pieces, the ties being broken, torn from the rails, and
bunched up, until the Kara was torn loose from the for-
ward car, after which it turned over . . . and down
the bank of the fill." About one hundred feet east from

the point where the Kara overturned, the Polynesia broke loose from the rest of the train. There was a curve in the track where the wreck occurred, and some repairs were being made at that point. The old ties were being removed, and new ties put in their place. T. J. Gallagher, who was section foreman, and in charge of the work, testified as to the condition of the track at that point on the day of the accident, as follows: "It was raised, but not finished. Ballast had been tamped down under the ties, but no filling had been placed between the ties. The track at the point of the accident was like sticks on the top of a table. It was what we would term a 'skeleton track.' Just at that hour [time of accident] the ties put in that day were not spiked until after the wreck." On cross-examination he further testified: "The track, where the car left the rails, and where the Kara went over the embankment, had been raised. . . . The ties were very much decayed and broken, and the roadbed was all loose. The decayed condition of the ties extended clear through them, and there was about twelve or fifteen poor ties to one good one. I could pick a tie to pieces with my fingers. I did this with several ties—five or six, probably a dozen." And another witness testified: "The ties were very poor. They were rotten, so that I dug my finger nail into them without any trouble at all. The ties were so rotten that the spikes could not get a firm hold in many instances." Some five or six other witnesses testified to substantially the same facts respecting the condition of the ties as those whose testimony we have quoted. Pieces of some of the old ties that were torn up and broken in the wreck were made exhibits in the case, and these exhibits substantiate all that is said by the witnesses in regard to the rotten condition of the ties. In fact there is no substantial conflict in the evidence on this point.

Defendant's most important witness on this feature of the case testified in part as follows: "Q. You heard the testimony read here with reference to the ties being rotten, and all that sort of thing? A. I did. Q. Were any ties that

constituted part of the roadbed in the condition as you heard
described here? A. Why some of them, of course, were,
naturally, somewhat decayed, because they were constantly
decaying." A physician and surgeon by the name of R.
Morton Smith, who was with plaintiff in the smoking com-
partment of the car Kara at the time it was derailed, and
who assisted in dressing his wounds after he was taken from
the wreck, testified as to the nature and extent of the injuries
received by plaintiff as follows: "I was conscious all the
time and could follow the movements the car made in turn-
ing over. I saw Mr. Johnson [plaintiff] immediately after
the car stopped. As he got up I saw he was bleeding very
profusely from his throat, and a long cut was visible along
the left side of his neck, and the blood was running down
over his clothes very freely. . . . Mr. Johnson was
taken out of the car through the window, which was then
the top of the car, . . . and assisted to the ground. On
reaching the ground we helped him up the bank, which I
would judge was some fifteen or eighteen feet high, and then
along the track some distance until we came to the car Poly-
nesia. We took him up the steps of the Polynesia, during
which time he became unconscious. We laid him in the aisle
of the car. . . . At that time he was in a collapsed con-
dition. He was pulseless and the indications were he was
dying. He appeared to be dead at that time. We gave him
a hypodermic injection of strychnine, and after a time he
recovered. The external jugular vein was severed. That
vein lies down the side of the neck. . . . The external
jugular was plainly visible. . . . Mr. Johnson was un-
able to speak at that time. I think it was a couple of days
before we could tell what Mr. Johnson was saying when he
whispered. Mr. Johnson's physical collapse was due to loss
of blood and shock. . . . His throat would fill with
mucus, and he would have trouble in trying to get rid of it.
He expectorated bloody mucus from his mouth. That con-
tinued from Monday, the time of the injury, until Thursday
after midnight, and that is as far as I know about it [On

this date witness parted company with plaintiff.] He could not speak at that time, and still had trouble with his breathing. . , . Besides the cut in his throat Mr. Johnson had a bruise on the forehead, a cut on the chin, and some bruises on the chest and on his knees. . . . While on the trip after the accident he could swallow a part of a teaspoonful of water, beef juice, and malted milk. . . . The fact that Mr. Johnson, on his way home, kept raising bloody mucus from his throat indicates a puncture of the throat. . . . I saw him a few months after he got home. His condition was then improving. Along the first few months his voice was very bad. He had great difficulty in swallowing food for about six months. . . . In my opinion Mr. Johnson's inability to speak or swallow after the accident was due to paralysis arising from the cut received in the derailment. . . . In my opinion his injury is permanent. The condition of the vocal chords is worse now than a year ago. In my opinion this condition will continue if it does not get worse." Some ten or twelve other witnesses, who were passengers on this train at the time the wreck occurred, several of whom were physicians and surgeons, testified for plaintiff, and their testimony is substantially the same as that given by the witness Smith.

There was much evidence introduced tending to show that as a result of his injuries plaintiff's voice has become "husky, weak, and feeble"; that he cannot talk more than about ten minutes at a time without his voice failing him; that his physical strength in general, and his ability to look after and transact business pertaining to his profession as a lawyer, are materially and permanently impaired. One of the defendant's witnesses, a physician and surgeon, and one of the leading men in its medical department, testified in part as follows: "The condition of Mr. Johnson's [plaintiff's] throat is not a small matter. No; it is a serious matter. It involves the whole pharynx and the larynx and the tonsils." Plaintiff's income from his profession as an attorney and counselor at law for the three years next preceding the ac-

cident was from $7,500 to $9,500 per year, and for the three years intervening between the accident and the trial of the case his income from the same source was from $4,300 to $5,700 per year. And there is an abundance of evidence in the record which tends to show that this falling off in his business was due to the injuries he received in the wreck. In fact there is but little, if any, conflict in the evidence on this point.

McCARTY, J. (after stating the facts as above).

The first assignment of error discussed by counsel for appellant relates to the admission in evidence, over their objection, of certain photographs of the derailed cars and of the railroad tracks and grade at the point where the wreck occurred. It is a well-settled rule that photographic views, when proved to be correct representations of persons, objects, or localities which are subject-matters of inquiry in an action or proceeding, are admissible in evidence to aid the court or jury to apply the facts proved to the particular case. (*Dederichs v. S. L. Ry. Co.,* 14 Utah 137, 46 Pac. 656, 35 L. R. A. 802; *State v. McCoy,* 15 Utah 136, 49 Pac. 420; *Kansas City, etc., R. R. Co. v. Smith,* 90 Ala. 25, 8 South. 43, 24 Am. St. Rep. 753; 2 Jones on Evidence, 597; 22 Am. and Eng. Ency. Law (2d Ed.), 773.) The photographs in this case were taken about an hour after the wreck occurred. In the meantime a gang of workmen had commenced clearing away the debris, and piling up the ties that were torn loose from the roadbed by the derailed cars. It is contended that the photographs were incompetent, and should have been excluded, because they were taken after "certain changes had been made by reason of these workmen commencing to pick up the wreck and clear up the track." The photographs were made a part of the bill of exceptions. Among other things, they show a pile of broken ties on the side of the railroad grade where the accident occurred. The record shows that the piling of these ties was the only change made in the wreckage up to the

time the photographs were taken. It is conceded that
these ties were taken from the wreck, and it is also
conceded that they were broken and torn loose from
the roadbed by the derailed cars. We think the photographs
were properly admitted in evidence. Furthermore, one of
the appellant's principal witnesses, in describing the condi-
tion that the track was in immediately after the wreck, testi-
fied that: "It was torn up. The ties were broken and
bunched." It will therefore be observed that the photo-
graphic views objected to illustrated a condition or feature
of the wreck over which there is no controversy. In fact the
testimony of the witnesses, considered separate and apart
from the photographic views, shows the ties to have been in
a much worse condition than the photographic views would
indicate. The photographs do not show nor illustrate the
decayed and unsound condition of the ties. Though
it were conceded that, as an abstract proposition of
law, the admission in evidence of the photographic
views of the piles of ties referred to was error, we would be
compelled, in the face of this record, to hold that it was
harmless error.

Nor did the court err in permitting Potter and Astle,
two of respondent's witnesses, to testify as to his condition
since the accident compared with what it was before the ac-
cident. The record shows that Potter had known respondent
for about three years, and that Astle had known him for
more than twenty years, before the accident. They assisted
in taking him from the wrecked car, and in caring for him
during the rest of his journey homeward. They occasion-
ally met and talked with respondent during the two years
intervening between the time of his arrival home and the
trial of the case. Potter testified that before the accident
respondent's voice was "ordinary;" that it was "clear," and
since the accident it has been husky and weak. Astle tes-
tified that before he was injured respondent appeared to be
a healthy man, and that he had never known him to have
sickness of any kind; that his voice was clear and strong,

and since the accident "it seems husky," and is "consider-
ably weaker." The follówing is a fair sample of the ques-
tions asked these witnesses, and their answers, to which ob-
jections were made and exceptions noted: "Q. How did
he appear then [several weeks after the accident] as com-
pared with the way he appeared before the accident? A. He
hadn't his voice—showed the results of what he had been
through." It is urged that these witnesses were nonexperts;
that they were not qualified to express an opinion respecting
the state of respondent's health before the accident as com-
pared to what it has been since. This evidence was clearly
admissible. The authorities uniformly hold that
witnesses who are not experts are competent to testify
as to whether a person with whom they are ac-
quainted, and whose appearance and conduct they have ob-
served, is in good or bad health, has a strong or weak voice.
In 17 Cyc. 88, it is said:

"Such an observer may also state a change in apparent condi-
tion, whether the change is from sickness to health, or from health
to sickness, or from bad to worse, or from worse to better. He
may also infer and state that a person's ability to help himself, or
his faculties, or the use of his limbs, or other parts of his body, or
his earning capacity, has or has not been impaired."

Many cases are cited in the note which fully support the
foregoing propositions. Further, it is a well-settled rule
that where a witness details the facts upon which he bases
his opinion, the error, if any, is usually harmless,
and especially so where, as in this case, the evidence
shows that the jury must have reached the same con-
clusion as the witness. (17 Cyc. 60; *Davis v. O. S. L. R.
Co.,* 31 Utah 307, 88 Pac. 2.)

Fourteen of plaintiff's witnesses, who were passengers on
the train at the time of the accident, testified as to the rate
of speed at which the train was going just prior to and at
the time the cars were derailed, and they variously esti-
mated the speed to be from thirty to fifty miles an hour.
Two witnesses for defendant estimated the speed to be from

twenty-three to twenty-five miles per hour. Objections were made and exceptions taken to the testimony of three of plaintiff's witnesses on this point, on the ground that they were not shown to be qualified to express an opinion as to the rate of speed at which the train was running. One of them estimated the speed to be from forty-five to fifty, another at thirty miles, and the other from thirty to thirty-five miles per hour. This evidence was clearly admissible. It in no sense involved a question of science requiring special learning or skill on the part of the witnesses to determine, but related to a matter that is within the common knowledge of mankind generally. And the authorities seem to hold that a person of average intelligence, who has observed a moving train on a given occasion, is competent to express an opinion, if he has one, as to the rate of speed at which it was traveling. Of course the weight to be given the opinion of a witness on matters of this kind will depend upon his intelligence, learning, experience, and the degree of attention he gave the particular matter which is the subject of inquiry. The following authorities illustrate and uphold this general doctrine: *Chipman v. Union Pacific R. R. Co.,* 12 Utah 68, 41 Pac. 562; *Chicago, B. & Q. v. Gunderson,* 174 Ill. 495, 51 N. E. 708; *Johnson v. Oakland Ry. Co.,* 127 Cal. 608, 60 Pac. 170; *Thomas v. Railway Co.,* 86 Mich. 496, 49 N. W. 547; *Walsh v. Railway Co.,* 102 Mo. 582, 14 S. W. 873, 15 S. W. 757; *Ward v. Railway Co.,* 85 Wis. 601, 55 N. W. 771; 17 Cyc. 106, and cases cited in note.

Furthermore, the testimony of eleven of plaintiff's witnesses who testified as to the rate of speed at which the train was traveling is not assigned as error. Two of these witnesses testified that the speed of the train was about fifty miles per hour; two estimated it to be between forty and fifty miles; two from forty to forty-five; and three at about forty miles an hour. Conceding, for the sake of argument, that the testimony objected to should have been excluded, the admission of the foregoing evidence without ob-

jection rendered it harmless. (17 Cyc., pp. 61, 62; *Chipman v. U. P. Ry. Co., supra.*) Besides, we think the facts and circumstances, as detailed by Arthur Jung, one of defendant's principal witnesses, show conclusively that the train, at the time the cars were derailed, was traveling at a high rate of speed. Jung was an experienced railroad man. The record shows that for twenty-three years he had been connected with the construction department of first one, and then another, of three different railroad companies, and at the time of the accident he was, and for three years prior thereto had been, roadmaster of this particular division of defendant's road; that he was riding on this particular train at the time the wreck in question occurred. He testified that immediately after the wreck he went back and examined the track to the point where the cars were derailed, and found that after they had left the track the train proceeded more than one thousand two hundred feet before it was brought to a standstill; that it was nine hundred and forty-three feet from the point of derailment to where the car Kara overturned, and from that point to where the car Polynesia broke loose from the train was one hundred feet, and from the Polynesia to the Amsterdam, which was the rear car of what was left of the train when it stopped, was about one hundred and sixty-five feet; that it was almost a minute from the time the cars were derailed until the train was stopped. Another witness for appellant testified that immediately after the cars left the track the air brakes were "applied very severely." Therefore, according to the testimony introduced on behalf of defendant, the average rate of speed at which this train traveled from the place of derailment to where it stopped was about fifteen miles an hour. That is, the train, with the throttle of the engine closed, the air brakes applied, two Pullman cars completely derailed, and the two rear wheels of another car off the track and the great impediment which the tearing up of the track for two hundred feet by the derailed cars must have been to its speed, proceeded nearly a quarter of a mile before it could be stopped.

We are therefore of the opinion that there is no real or substantial conflict in the evidence as to the speed of the train at the time the cars left the track.

Appellant's next contention is that the court erred in permitting the witness Gallagher to testify to the speed limit of trains at the time of the accident over that portion of the road where the accident occurred. Gallagher was section foreman over the portion of the road where the accident occurred, and for several days before the accident had been engaged in repairing the road at that point. He testified that he obtained his information respecting the speed limit of trains over this particular part of the road, which was fixed at fifteen miles an hour, in a letter written to him by his superior officer; that on the 1st day of August, 1905 (nearly a year before the trial of the case), at Junction City, Kan., he turned over all the papers to his successor, including the letter in question, and that he had not seen the letter since, and did not know where it was. Objections were made to the testimony respecting the speed of the trains on the grounds that it was immaterial, incompetent, and not the best evidence. This assignment is without merit. The letter related to a collateral matter which was no part of the subject-matter of the action. That is, neither the letter, nor the matter to which it referred, was directly involved in the case; nor did it relate to a matter which the law requires to be in writing. Therefore it does not fall within the general rule which holds that before parol evidence of the contents of a written instrument can be received, it must be shown that the writing is lost, destroyed, or under the control of the party against whom the evidence is offered, and that a demand was made upon such party to produce the writing in court to be read in evidence, and that he refused to comply with the demand.

The case of *Polly v. McCall*, 37 Ala. 20, was an action to recover damages for the overflowing of plaintiff's land, and proof of a written notice from plaintiff to defendant, requesting an abatement of the ditch and levee by which the over-

flow was caused, was offered and admitted over defendant's objection. On appeal the Supreme Court said: "Neither did the court err in admitting oral testimony of the written notice served in this case. This fact was collateral to the issue; was not necessary to the plaintiff's success in the suit, either in consequence of any requirement of the law or of the pleadings in the cause." The court held that it was within the exception to the general rule in regard to the proof of writings. McKelvey, in his work on Evidence (page 344) says: "Where the writing is not in issue, but merely collateral to it, it is held that the rule has no application, and parol evidence may be given, even though it covers the contents of the writing." So in 1 Greenl. on Ev., section 86, the author says: "Where, however, the record or document appointed by law is not part of the fact to be proved, but is merely a collateral or subsequent memorial of the fact, such as the registry of marriages and births, and the like, it has not this exclusive character, but any other legal proof is admitted." See, also, sections 89, 90. In 17 Cyc. 469, the rule is stated as follows: "Evidence relating to a matter which does not form the foundation of the cause, but is collateral to the issue, does not properly fall within the best evidence rule, and, although secondary in its character, cannot be excluded on the ground that primary evidence is obtainable." In 2 Ency. Ev. 285, it is said: "Where the contents of a writing come collaterally in question, such writing need not be produced, but the contents may be established by parol evidence"—citing many cases.

There is another reason why this assignment of error must be overruled. It was shown that the letter in question was not within the jurisdiction of the court, and the rule, as declared by the great weight of authority, is that when a writing which is necessary in evidence is traced to the hands of a party not within the state, secondary evidence, without further showing, may be given to prove the contents of such writing. This court so held in the case of *Dwyer v. Salt Lake City*, 14 Utah 339, 47 Pac. 311. And

the doctrine as announced in that case was reaffirmed in *Mc-Collom v. Southern Pacific Company,* 31 Utah 494, 88 Pac. 663. The following authorities also fully support the rule: 17 Cyc. pp. 529, 530; *Gordon v. Searing,* 8 Cal. 50; *Zellerbach v. Allenbergm,* 99 Cal. 73, 33 Pac. 786; *Manning v. Maroney,* 87 Ala. 563, 6 South. 343, 13 Am. St. Rep. 67; *Knickerbocker v. Wilcox,* 83 Mich. 200, 47 N. W. 123, 21 Am. St. Rep. 595; *Burton v. Driggs,* 20 Wall. 134, 22 L. Ed. 299; *Stevens v. Miles,* 142 Mass. 571, 8 N. E. 426; *Smith v. Nat. Bank,* 82 Tex. 368, 17 S. W. 779. Nor can it successfully be urged that the objection was good on the ground of the immateriality of the evidence, as it tended to show that the officers and agents of appellant had notice of the alleged unsafe condition of this particular piece of track, and that it was unsafe to operate trains over it at a greater rate of speed than fifteen miles per hour. When the testimony was offered, counsel for the respondent announced to the court, and in the presence and in the hearing of the jury, that this was the only purpose for which it was offered.

One of the respondent's attorneys, in making his opening statement to the jury, said: "Fifty-four out of fifty-six of the persons in this party were injured in the wreck, and testimony is before the jury that settlement was made with all but two of the persons injured. By thus settling with all those who were injured except two, the company has admitted its liability for the damage done by this wreck more than fifty times." It is strenuously urged, on behalf of appellant, that these remarks constitute reversible error. On cross-examination of one of respondent's witnesses counsel for appellant elicited the following testimony: "I met Dr. Perkins and Mr. Manchester, claim agent for the railroad, in Providence, R. I., about six weeks after the accident. Q. You remember the mission they were on? You were taken into their councils? A. Yes; I understood they were down to try and make settlement with some of those who had not been settled with. Q. Yes. There were only three that

hadn't been adjusted? A. I do not know. Q. Don't you remember that, right at the time of the wreck, they were all adjusted except three or four? A. There were very few; yes, sir." The Dr. Perkins referred to was called as a witness in behalf of the appellant, and he testified, in part, as follows: "Q. Do you know whether or not, before this party left Junction City, they were all, or what portion of them were settled? A. Some of the settlements were made going down on the train. . . . Some were made in Junction City, and some on the train after leaving Junction City. Q. Do you know how many were not settled with, if any, at the time of the wreck? A. There were a few that were not settled. There was Mr. Johnson and his wife, and Mr. and Mrs. Peck, and one or two others. That is all I remember of."

In the course of his cross-examination this witness volunteered the following statement: "Most cases, you understand, on the railroads now are settled; those that are reasonable." Counsel then asked the following question: "Well, those that ask for a reasonable sum in comparison to their injuries?" The witness answered: "That is, if the railroad thinks it is reasonable, they settle; yes. We settle ninety-nine out of one hundred, and it isn't the railroad's fault that they don't settle the other one." And again he says: "I think the railroads have been very reasonable in the last fifteen years. . . . I think our claim agents are very reasonable; they try to make the men satisfied." We can conceive of no purpose for which counsel for appellant introduced this matter into the case, unless it was to impress upon the minds of the jury that it is the policy of the railroad company to make a fair and honorable settlement of all just claims for damages made against it, and further to create the impression that the case at bar would have been amicably settled had it not been for what the railroad company deemed the unreasonable and extortionate demands of respondent. However, we are not concerned as to the motive counsel for appellant may have had in introducing this ele-

ment into the case, but, having done so, without limiting it to any special purpose, counsel on the other side had a perfect right to comment upon it, and to draw therefrom any inferences, by way of argument, of which it was susceptible; and, so long as he kept within the bounds of decorum, appellant had no right to complain. But conceding, for the purposes of argument, that counsel did exceed the limits of legitimate argument, and that the remarks complained of were improper, this assignment of error must nevertheless be overruled. The record shows that the remarks were made in the opening argument for respondent; that counsel for appellant was present at the time and made no objection thereto, but permitted the attorney making them to proceed without interruption. No objection was made at all to the remarks, nor was there any exception taken to them until after the case was submitted to the jury and the jury had retired to consider their verdict. Nor did appellant ask the court to instruct the jury to disregard the remarks. The great weight of authority holds that a party, in order to avail himself of the misconduct of opposing counsel in the argument of a case, and have it reviewed on appeal, must make a seasonable objection, and thereby give the trial court an opportunity to remove any prejudicial effect it may have had on the case by admonishing the offending counsel to desist, or by timely instruction to the jury to disregard the objectionable remarks.

We do not wish to be understood as holding that in all cases of misconduct of this character an admonition, rebuke, or reprimand from the court, even when supplemented by cautionary instructions to the jury, will remove the prejudicial effect produced by the misconduct. Instances may, and do sometimes, occur when the misconduct is so flagrant and of such a character that neither a vigorous reprimand of counsel nor an instruction to the jury can right the wrong inflicted on the adverse party by such misconduct. But even in such cases the authorities practically all hold that it is incumbent upon the aggrieved party, if he intends to rely on

the misconduct as error, to interpose objections thereto at the time it occurs. Thompson, in his work on Trials (section 957) tersely and, as we think, correctly states the general rule as follows:

"In the discharge of this office, as of every other, the presiding judge is entitled to reasonable aid from the counsel in the case on trial, or from the parties themselves, where they appear in propria persona. Where counsel, in arguing to the jury, exceed the limits allowed to advocacy, the way to correct the prejudicial effect of the argument is either to object to it at the time, to answer it by counter argument, or to ask suitable instructions to the jury with reference to it. After verdict it comes too late; and, whether the objection is saved for review by affidavit, or by a recital in a bill of exceptions (according to the practice in the particular jurisdiction), it is equally necessary that the record should show that the objection was made at the time of the misconduct."

The following authorities illustrate and support this doctrine: 2 Ency. Pl. & Pr. 755; Spelling, New Tr. & App. Pro. 90; *State v. Spencer,* 15 Utah 149, 49 Pac. 302; *C., B. & Q. Ry. Co. v. Kellogg,* 55 Neb. 748, 76 N. W. 462; *U. P. Ry. Co. v. Field,* 137 Fed. 14, 69 C. C. A. 536; *Rudolph v. Landwerlen,* 92 Ind. 34; *Metropolitan Ry. Co. v. Johnson,* 90 Ga. 500, 16 S. E. 49. Furthermore, section 3304, Comp. Laws 1907, so far as material here, provides:

"WHAT MAY BE REVIEWED ON APPEAL.—Upon an appeal from a judgment, all orders, rulings and decisions in an action or proceeding to which exceptions have been taken in the court below, or which are deemed excepted to, as provided by this Code, are before the Supreme Court for review."

Misconduct of counsel in making improper remarks to the jury in the course of an argument is not one of the matters deemed excepted to. Section 3282, Comp. Laws 1907, provides:

"An exception is an objection upon a matter of law to the decision made by a court, judge, referee, or other judicial officer, in an action or proceeding. The exception must be taken at the time the decision is made except as provided in the next section."

By an examination of the next section it will be seen that the matter under consideration does not fall within it. Under these provisions of the statute it seems plain that an exception must be taken to an order, ruling, or decision of the court, otherwise it will be unavailing on appeal for any purpose. In this case no objection, formal or otherwise, was made to the alleged improper remarks; nor was there any request made for an instruction to the jury on the subject. Consequently there was no ruling or refusal to rule thereon by the court, and hence there is nothing in this assignment of error which we are authorized to review. What we have here said disposes of several other assignments of error which are based upon the alleged misconduct of counsel for respondent in their discussion of the case to the jury.

In conclusion we remark that, after a thorough and careful examination of the entire record, we are satisfied that the case was fairly and impartially tried, and that no injustice has been done. There is an abundance of evidence to sustain the verdict.

The judgment of the court below is affirmed, with costs.

STRAUP, C. J., and FRICK, J., concur.