Juanita J. MEYER, Plaintiff, Intervenor-
Defendant and Respondent,

v.

GENERAL AMERICAN CORPORATION,
a corporation, and Paul J.
Angelos, Defendants,

v.

William R. McCURTAIN, Intervenor-
Plaintiff and Appellant.

No. 14805.

Supreme Court of Utah.

Sept. 1, 1977.

William R. McCurtain, pro se.

David S. Cook, Jerry W. James, Robert R. Dansie, Salt Lake City, for defendant and respondent.

ELLETT, Chief Justice:

The Intervenor-Appellant (hereafter referred to as "McCurtain") appeals from a judgment entered in favor of Plaintiff-Respondent (hereafter referred to as "Meyer") wherein the trial court held that McCurtain's purchase of a D–9 caterpillar was a fraudulent sale within the meaning of the Utah Fraudulent Conveyance Act and, therefore, void. Briefly, the pertinent facts may be summarized as follows:

Meyer loaned $12,000 to General American Corporation (hereafter referred to as "*G*AC") for the purpose of providing operating capital for their mining operation and to purchase a D–9 caterpillar that was necessary to the business. GAC executed promissory notes and a security agreement, giving Meyer a security interest in the caterpillar as collateral for the loan. A financ-

ing statement was not filed. On May 1, 1974, Terra Corporation (hereinafter referred to as "Terra") loaned $2,000 to GAC in return for GAC's promissory note and a security interest in the caterpillar. A financing statement was filed by Terra with the Secretary of State on October 25, 1974. On July 8, 1974, Terra loaned an additional $500 to GAC, canceled the $2,000 promissory note and received in exchange GAC's Bill for Sale for the caterpillar. The following day, July 9, 1974, Terra sold the caterpillar for $2,500 to McCurtain and gave him a Bill of Sale. McCurtain did not take possession of the machine, however; it was delivered to Wheeler Machinery Company who billed Terra for storage charges. Meyer subsequently learned of these conveyances through a mine employee who operated the machine and initiated a suit against GAC on October 11, 1974. A Writ of Attachment was issued on that date and later filed with the county clerk on October 18, 1974. When McCurtain learned of the attachment, he intervened in this suit, and it came to trial on July 22, 1976. The court, sitting without a jury, entered judgment in favor of Meyer, and found that the Bill of Sale given to Terra by GAC was void for failure of fair consideration and lack of good faith; and further, that the subsequent sale from Terra to McCurtain was void for the same reasons. Both transactions were declared void under the Utah Fraudulent Conveyance Act. The court further held that Meyer's Writ of Attachment was valid and that she was entitled to levy execution on the caterpillar.

McCurtain appeals this decision, claiming the following errors:

(1) That the evidence submitted does not support a finding that McCurtain's purchase was void under the Utah Fraudulent Conveyance Act, and

(2) That as a purchaser, taking from a party holding a duly perfected security interest, his interest has priority over Meyer's unperfected security interest and that the proper priorities should have been resolved under the Utah Uniform Commercial Code.

■ The applicable sections of the Utah Fraudulent Conveyance Act are discussed below:

*25–1–4, U.C.A., 1953 as amended.*

Every conveyance made, and every obligation incurred, by a person who is, or will be thereby rendered, insolvent is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

Both the statute and case law interpreting the statute make it clear that subjective or actual intent to defraud are *not* elements of a fraudulent conveyance claim.[1] Meyer is obligated to show only (1) that she was a creditor of GAC; (2) that GAC was insolvent at the time the conveyance was made to Terra; and (3) that the conveyance was not given for a "fair consideration." The promissory note entered into evidence is adequate to prove Meyer's status as a creditor; indeed, there was no dispute in the lower court as to this fact.

*25–1–2, U.C.A., 1953 as amended.*

A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to satisfy his probable liability on his existing debts as they become absolute and matured.

■ The level of insolvency necessary to meet the statute requirement is not insolvency in the bankruptcy sense but merely a showing that the party's assets are not sufficient to meet liabilities as they become due.

■ The record shows that McCurtain's own witness, a broker-dealer, testified that there was no market for the GAC stock and there had not been a market for a long time. Market inactivity is one indication of a failing financial condition. The record also shows that Meyer loaned the $12,000 to GAC *because* of GAC's insolvent condition, and she further testified that she made a personal examination of GAC's books wherein it was disclosed that the liabilities exceeded the assets. She also testified that GAC had failed to make payments on her loan. No objections were raised to this evidence except as to the admission of Meyer's testimony regarding the company records. This was objected to as a violation of the best evidence rule.[2] That rule, however, does allow secondary evidence to be submitted at the court's discretion when it is not possible to obtain the original document.[3]

■ In the instant case, the record shows that a search was made to produce the company books, that GAC's president had custody of the books but refused to grant access to them when requests were made, and that after an extensive search, it was determined that GAC's president had left the state so that the records could not be produced. Under these circumstances, the trial court correctly admitted the disputed testimony into evidence as a proper exception to the best evidence rule.[4]

■ The evidence, when considered as a whole, is sufficient to prove the insolvent condition of GAC at the time the conveyance was made to Terra. Insolvency alone, however, does not justify a finding that the conveyance is fraudulent unless it was made without a fair consideration.[5] Fair consideration is defined by statute[6] as requiring that the conveyance be made for both a "fair equivalent" *and* in "good faith."

**1.** *First Security Bank of Utah v. Vrontikis Bros., Inc.,* 26 Utah 2d 422, 490 P.2d 1301, 1302 (1971); *Bowman v. White,* 13 Utah 2d 173, 369 P.2d 962, 963 (1962).

**2.** 78–25–16, U.C.A., 1953; Rule 70, Utah Rules of Evidence (1971).

**3.** Id.

**4.** See the discussion in McCormick, D., *McCormick's Handbook of the Law of Evidence,* (2d Ed. 1972), Section 237 at 570; *Johnson v. Un-ion Pacific Railroad Co.,* 35 Utah 285, 100 P. 390, 395 (1909) wherein this Court held that when a writing which is necessary in evidence is in the hands of a party not within the state, secondary evidence may be received to prove the contents of such writing.

**5.** 25–1–4, U.C.A., 1953 as amended.

**6.** 25–1–3, U.C.A., 1953 as amended.

Fair equivalent has been deemed to mean "such a price as a capable and diligent businessman could presently obtain for the property after conferring with those accustomed to buy such property." [7] In *First Security Bank v. Vrontikis,* supra, it was determined that 13% of the property's proven worth was not a fair equivalent. The *Dooley* test (footnote 7 supra) indicates that retail, not wholesale value is the measure; and McCurtain, himself, testified: "I had the tractor sold for $20,000 so that establishes a pretty good value." Expert testimony produced by McCurtain also set the caterpillar's value between $20,000 and $25,000.

McCurtain paid $2,500 for this machine which is grossly disproportionate to the real value and supports the trial court's finding of failure of fair consideration. As to his claim that he actually paid more than $2,500 because of an oral agreement to split profits with Terra, there is no evidence, written or otherwise, to support his testimony; and since he is a party to this suit, the court was not bound to believe him. The Bill of Sale given by Terra indicates exactly the opposite by specifically reciting that the "caterpillar is free and clear of any liens, claims or demands of any person whatsoever . . ."

To support the good faith requirement, McCurtain relies on his status as a bona-fide purchaser under 25–1–13, U.C.A., 1953 as amended:

The provisions of this chapter shall not be construed to affect or impair the title of a purchaser for a valuable consideration, unless it appears that such purchaser had *previous notice* of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor. [Emphasis added]

■ It is notice, not knowledge, that the purchaser must have, and it need not be actual notice—constructive notice is suffi-cient to defeat the purchaser's claim. Constructive notice can occur when circumstances arise that should put a reasonable person on guard so as to require further inquiry on his part.[8] Here, McCurtain admitted that the purchase price was "unusual" and that he bought the caterpillar sight unseen because of its low price. He also testified that he knew the caterpillar could be sold for a much higher value—approximately 10 times what he paid for it, in fact. This circumstance alone is sufficient to put the purchaser on notice that the transaction may be tainted and that other parties are likely to be involved.

Other indicia of fraud—failure of Terra to deliver the caterpillar to McCurtain, failure of McCurtain to take steps to protect his interest, and the attempt made by the parties to keep the transactions "secret" from Meyer (GAC was unresponsive to her telephone and written requests concerning the status of her loan and the collateral)—are enough to justify the court's findings.[9]

Under the evidence as presented, the trial court committed no error in holding that the conveyance from GAC to Terra and, subsequently, to McCurtain, was void.

■ McCurtain argues that the Utah Uniform Commercial Code, not the Utah Fraudulent Conveyance Act, should have been applied to find his interest superior to that of Meyer because of the priority sections of Article 9 (Secured Transactions). An examination of the history of the Uniform Commercial Code in Utah [10] indicates that the adoption of the UCC was intended to supercede certain legislation in effect at that time. Specific laws were expressly repealed, including Sections 25–2 through 25–4, U.C.A., 1953. Section 1 of Title 25, was *not* repealed, however, indicating that the legislature intended to retain the Utah Fraudulent Conveyance Act in full force and effect as a protection against the kind of double financing engaged in here that

**7.** *Utah Assets Corporation v. Dooley Bros.,* 92 Utah 577, 70 P.2d 738, 742 (1937).

**8.** *McGarry v. Thompson,* 114 Utah 442, 201 P.2d 288, 290 (1948).

**9.** See 37 Am.Jur.2d, Fraudulent Conveyances, Sections 12 and 17.

**10.** Laws of Utah, 1965, Chapter 154.

might work an unjust result against an innocent party because of a strict application of the priorities established in the new statute.[11]

 When a conveyance is found void under the Utah Fraudulent Conveyance Act, it is treated as if the transaction never took place at all; hence, it is not necessary to reach the question of priorities under Article 9 of the Utah Uniform Commercial Code since the security agreement cannot be held to exist if the conveyance from which the security interest arose is void from its inception. The importance of the UCC should not be disregarded, however, and we feel it would not be remiss to discuss its application to the instant case since it is our opinion that Meyer would still prevail under the UCC as well as the Utah Fraudulent Conveyance Act.

The scope of Article 9 extends to all transactions intending to create a security interest[12] and the general rule is that the first to file *or* to perfect his interest has priority over other creditors, with some exceptions. Filing always perfects a security interest once it has attached, but some perfections can occur *without* filing. It is necessary to distinguish between the two.

Filing is required to perfect a security interest unless it falls within one of the stated exceptions.[13] Perfection occurs when the interest has "attached" and all the other requirements (filing) are met. Attachment requires: (1) an agreement that it attach; (2) that value be given; and (3) that the debtor have rights in the collateral.[14] A properly executed security agreement may be evidence that attachment has taken place, and filing a financing statement completes the requirements for perfection.

Only a buyer in the ordinary course of business may take free of both a perfected

and an unperfected interest.[15] A buyer in ordinary course is described in 70A–1–201(9), U.C.A., 1953 as amended, as follows:

> . . . a person who in good faith . . . buys in ordinary course *from a person in the business of selling goods of that kind* . . . [Emphasis added]

In the instant matter, the evidence shows that Terra was *not* in the business of selling caterpillars so McCurtain fails to qualify as a buyer in the ordinary course of business under this definition. For this reason, the perfection requirement becomes paramount.

Meyer obtained an attachment against the property and the writ was properly filed on October 18, 1974. At that time, she became a lien creditor, and by law, lien creditors take priority over any unperfected security interest.[16] Terra filed a financing statement with the Secretary of State which perfected its security interest in the collateral, but this was not done until October 26, 1974 (after Meyer's lien was filed). Therefore, on the date Meyer became a lien creditor, Terra was in possession of an *unperfected* security interest which, by operation of the statute, was inferior to Meyer's status as a lien creditor.[17]

Another approach through Article 9 would still give Meyer priority over all other parties. When Meyer loaned $12,000 to GAC for the express purpose of purchasing a caterpillar, she became a purchase money lender, thereby creating a preferred purchase money security interest. The definition of a purchase money interest is found in 70A–9–107, U.C.A., 1953 as amended, and reads as follows:

> A security interest is a 'purchase money security interest' to the extent that it is

> \* \* \* \* \* \*

11. Title 70A, Section 9, U.C.A., 1953 as amended.

12. 70A–9–102, U.C.A., 1953 as amended.

13. See list of exceptions in 70A–9–302, U.C.A., 1953 as amended.

14. 70A–9–203, U.C.A., 1953 as amended.

15. 70A–9–307, U.C.A., 1953.

16. 70A–9–301(3), U.C.A., 1953 as amended.

17. *Id.*

(b) taken by a *person who by making advances* or incurring an obligation *gives value to enable the debtor to acquire rights in or the use of collateral* if such value is in fact so used. [Emphasis added]

The loan to purchase a caterpillar that was used to enable GAC to use the machine in its mining operation is a transaction which falls squarely within this category.

Some purchase money interests are given preferential treatment in Article 9. Filing is not required to perfect a purchase money security interest in consumer goods and in some farm equipment.[18] Whether certain machinery is classified as "equipment" or "consumer goods" depends primarily on the principal use to which it is put.[19] The caterpillar in this case is "equipment" rather than "consumer goods," because it was used primarily in GAC's mining business. It, therefore, falls outside the exceptions allowed in the statute [20] and must be filed in order to perfect. However, 70A–9–312(5)(a), U.C.A., 1953 as amended, still gives the priority to the purchase money security interest if filed first, providing both competing interests file, and it then takes priority regardless of when attachment occurs. This section, applied to the matter before this Court, gives Meyer priority because the Writ of Attachment, protecting her rights in the purchase money interest, was filed prior in time to Terra's financing statement.

Notwithstanding the foregoing analysis, Terra's perfected security interest in the caterpillar does not automatically extend to protect McCurtain as a purchaser of that same collateral. To allow such a far-reaching consequence would work a disadvantage to other creditors so as to defeat the purpose of Article 9 which is to put the public on notice as to all existing interests in the collateral and to permit an orderly procedure whereby subsequent creditors can move their priorities to a more favored position when another secured party who perfected first releases its interest in the collateral.

Of course it is possible for a secured party to *assign* its interest to a third party by complying with the provisions of 70A–9–405, U.C.A., 1953 as amended. There is nothing in the record before us, however, to indicate that such a proper assignment of the security interest was made by Terra to McCurtain. The claim for priority on this ground would not stand because of failure to follow the proper statutory procedure. McCurtain, therefore, is nothing more than an unsecured creditor whose claim is inferior to that of Meyer, a lien creditor.

It appears that both the Utah Uniform Commercial Code and the Utah Fraudulent Conveyance Act would support the judgment of the court below in this instance, and we find no error in the trial court's ruling. The judgment is affirmed with costs to Meyer.

CROCKETT, MAUGHAN, WILKINS and HALL, JJ., concur.

---

18. 70A–9–302, U.C.A., 1953 as amended.

19. See comments following Section 9–109 of the Uniform Commercial Code Official Draft, American Law Institute (1952).

20. Footnote 18, supra.