IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## WESTERN DIVISION.

---

### JACKSON, APRIL TERM, 1912.

---

### J. J. HUGHES v. STATE.*

(*Jackson.* April Term, 1912.)

1. MURDER IN THE FIRST DEGREE. Evidence held sufficient to sustain conviction.

The evidence is stated, reviewed, and held to be sufficient to warrant a verdict and conviction of murder in the first degree. (*Post, pp.* 51-66.)

2. CRIMINAL LAW. Photograph of scene of homicide is admissible in evidence for what it is worth.

A photograph of the scene in a room where a homicide occurred was properly admitted in evidence to show the recollection of a witness testifying as to the arrangement of the furniture in the room a short time before the homicide and immediately

---

*Use of photographs as evidence, see note in 35 L. R. A., 802. Effect and conclusiveness of photographs introduced in evidence, see note in 15 L. R. A. (N. S.), 1162.

(40)

Hughes v. State.

thereafter, and the position of the body of the deceased on the floor, where the witness testified that he knew the position of the various objects referred to, and that the location of the furniture was the same before and after the homicide, and that the photograph correctly represented them and their location, though the photograph was taken some time after the homicide. The photograph was introduced for the purpose of showing the position of the mentioned objects at the time of the tragedy, and to aid the jury in seeing these objects as the witness saw them; and it was the province of the jury to weigh and value the photograph as evidence as well as all the other testimony. (*Post, pp.* 66-71.)

Cases cited and approved: Moon v. State, 68 Ga., 687; Shaw v. State, 83 Ga., 92; State v. O'Reilly, 126 Mo., 597; State v. Kelly, 46 S. C., 55; People v. Mahatch, 148 Cal., 200; Sellers v. State, 91 Ark., 175, 313; Spokane v. Patterson, 46 Wash., 93; Britt v. Railroad, 148 N. C., 37; Harrison v. Green, 157 Mich., 690; Gaslight Co. v. Dean, 142 Ky., 678; Carlson v. Benton, 66 Neb., 486; State v. Matheson, 130 Iowa, 440; Higgs v. Railroad, 16 N. D., 446; Dederichs v. Railroad, 14 Utah, 137.

Case cited and disapproved: Fore v. State, 75 Miss., 727.

3. SAME. Accuracy of photograph may be proved by a witness other than the photographer who made it.

The fact that a photograph of a homicide scene, admitted in evidence, was not proved by the photographer who made it, is immaterial, where a witness testified that he knew the position of the various objects shown by the photograph and that it correctly represented the facts; for the accuracy of photographs may be proved by any one knowing the fact. (*Post, pp.* 66-68.)

Cases cited and approved: McGirr v. Babbitt, 61 Misc. Rep., 291, 113 N. Y. Supp., 753; Smith v. Railroad, 80 Vt., 208; McKarren v. Railroad, 194 Mass., 179; Consolidated Gas, etc., Co. v. State, 109 Md., 186; Traction Co. v. Scribner (Ind. App.), 93 N. E., 1014; Thompson v. Railroad, 48 Tex. Civ. App., 284.

4. **SAME. Photographs shown to be reasonably accurate are admissible in evidence to aid the jury; defects affect their weight, but not admissibility.**

Photographs are admissible in evidence, when shown to be reasonably accurate representations of the place or thing in question, to aid the jury in understanding the testimony of the witnesses in relation to the objects or things as presented. They belong in the law of evidence to the same class as models, maps, and plans. The mere fact that they are inaccurate in some particulars does not affect their admissibility, but goes only to their weight. (*Post, pp.* 68, 69.)

Cases cited and approved: Traction Co. v. Scribner (Ind. App.), 93 N. E., 1014; Hassam v. Safford, 82 Vt., 444; Territory v. Price, 14 N. M., 262; West v. State, 53 Fla., 77; Martin v. Knight, 147 N. C., 564; Railroad v. Morris, 80 Ark., 528; Johnson v. Railroad, 35 Utah, 285; State v. Hersom, 90 Me., 273.

5. **SAME. Admissibility of photographs in evidence is not affected because procured to be made by State's attorney.**

The admissibility of photographs in evidence is not affected by the fact that they were made at the instance of the State's prosecuting attorney to illustrate his theory of the case. (*Post, p.* 69.)

Cases cited and approved: State v. Remington, 50 Ore., 99; Burton v. State, 115 Ala., 1; Jarvis v. State, 138 Ala., 17.

6. **SAME. Admissibility of photographs in evidence is not affected by denial of their correctness testified to by another witness.**

The admissibility of photographs in evidence is not affected by the fact that the witnesses for the adverse party denied their correctness, where a witness for the party introducing same testifies to their correctness. (*Post, p.* 69.)

7. **SAME. Arranging before the jury the furniture in the room of the homicide is within the discretion of the trial judge.**

The trial court's action, over objection of defendant on trial for murder committed in a hotel room, in permitting, in the court

Hughes v. State.

room, and in the presence of the jury, the assembling and arranging of the furniture in the hotel room at the time of the homicide, including the carpet, table, and chairs, together with an alleged reproduction of a window of the room, to enable witnesses to testify as to the placement of the articles of furniture, was not reversible error; for the admission of such evidence was within the discretion of the trial judge. (*Post, pp.* 71-74.)

Cases cited and approved: Thrawley v. State, 153 Ind., 375; People v. Durrant, 116 Cal., 179; Painter v. People, 147 Ill., 444; State v. Martin, 47 S. C., 67; State v. Coella, 8 Wash., 512; Ruloff v. People, 45 N. Y., 213; People v. Searcy, 121 Cal., 1; Johnson v. State, 59 N. J. Law, 535; People v. Maughs, 149 Cal., 253, 8 Cal. App., 107.

8. **SAME. Same. Furniture and its arrangement in room of homicide may be introduced as rebuttal evidence, when.**

The assembling and arranging, in the court room and before the jury, of the furniture in the room of the homicide, is properly permitted as rebuttal evidence, where it has a distinct tendency to overturn the defense, though it might have been introduced as original evidence. (*Post, p.* 74.)

9. **SAME. Same. Same. Evidence in chief may be admitted in rebuttal in discretion of trial judge, without abuse of discretion.**

The trial court's admission of evidence in rebuttal, which should have been introduced as evidence in chief, rests in such court's sound discretion, and, in the absence of any abuse of such discretion, its action will not be disturbed or interfered with, upon appeal. (*Post, pp.* 74, 75.)

Case cited and approved: Moore v. State, 96 Tenn., 209.

10. **SAME. Recall of accused during State's rebuttal evidence to lay grounds to contradict him is not prejudicial where the grounds already existed.**

Where the accused testified that he believed that the decedent had stolen his diamond, and had not procured it from a third

person who had stolen it, the error, if any, in permitting the State, after the defendant had closed his evidence, and the State was engaged in the introduction of its rebuttal evidence, to question the accused as to whether he had told a certain police officer, at a certain time and place, that the deceased had not stolen his diamond, but that the third person had, and that the deceased had obtained it from such person, for the purpose of laying a foundation to impeach the accused by the contradicting testimony of such officer, was not prejudicial, because the accused could have been so impeached on the testimony so previously given by him. (*Post, pp.* 75, 76.)

11. SAME. Refusal to permit recall of witness by accused after State had closed its rebuttal evidence to prove what might have been proved on cross-examination is not ground for reversal.

Where the accused had full opportunity to inquire into a matter on his cross-examination of the State's witness, or to recall the witness when he put in the evidence for his defense, the action of the trial court in refusing to permit the accused, after the State had closed its evidence in rebuttal, to recall the witness for examination into such matter, was within the sound discretion of the court, and is no ground for reversal. (*Post, pp.* 76, 77.)

12. SAME. Court's refusal to permit corrborative witness to be examined for accused after State had closed its rebuttal evidence is not error, when there was no apparent reason for the delay.

Where the accused had called and examined a street car motorman as to the number of shots he heard and the intervals between them, and many months elapsed between the homicide and the trial, the court's refusal to permit the accused to introduce the conductor on the same car as said motorman, after the State had closed its evidence in rebuttal, to corroborate the testimony of the motorman, was no ground for reversal, especially where there was no apparent reason why said con-

Hughes v. State.

ductor was not secured as a witness at the proper time. (*Post*, *pp*. 77, 78.)

13. **SAME.** Accused may be cross-examined as to other offenses committed by him to affect his credibility as a witness.

On cross-examination of the accused on trial for murder, the State may prove that he had, prior to the said murder, killed other persons, and had shot at others, to affect his character and credibility as a witness, but the State will be bound by his answers and explanations. (*Post*, *pp*. 78-80.)

Cases cited and approved: Zanone v. State, 97 Tenn., 101; Ryan v. State, 97 Tenn., 206; Powers v. State, 117 Tenn., 363, 369.

14. **SAME.** Same. Whether cross-examination of accused as to other offenses may throw light upon his guilt or innocence need not be considered where he puts his general character in evidence.

Where the accused introduces witness to show his good character for peace and good order, he thereby makes his general character the subject of examination, as throwing light upon his guilt or innocence; and in such case, the question whether the evidence brought out on cross-examination, as shown in the preceding headnote, might have been properly used for the purpose of throwing light upon his guilt or innocence need not be considered by the supreme court. (*Post*, *pp*. 80, 81.)

15. **SAME.** Improper remark of spectator is no ground for new trial where jury was instructed not to consider it, especially if it is not shown that jury heard same.

Where, on the trial of the accused for murder, and while he was being cross-examined as a witness, the widow of a third person killed in a sister State, by the accused, was in the court room, and characterized a statement by the accused as "an emphatic story," and thereupon the trial judge reprimanded her, and stated that, if she repeated her offense, she would not be permitted to remain, and instructed the jury not to consider any remark made by her, her such misconduct was not ground for

a new trial, especially in the absence of a showing that the jury heard the remark. (*Post, pp.* 81, 82.)

16. **SAME. Presence of widow of a previous victim of accused on trial for a subsequent murder for making suggestions to State's attorney in cross-examination of accused is no ground for reversal, when.**

While the accused on trial for murder was being cross-examined by the State as to previous homicides committed by him in a sister State, the action of the court in permitting the widow of one of his victims to remain near the State's attorney and make suggestions to him as to the cross-examination of the accused, was no ground for reversal, especially where the accused had been acquitted on a trial for such killing, and the jury was instructed to pay no attention to the evidence with respect to it, and where it does not appear that she was so placed there by the State's attorney for the purpose of influencing the jury. (*Post, pp.* 82, 83.)

17. **SAME. Improper remark of the State's attorney as to his knowledge of the facts as to a previous killing was not prejudicial where jury was properly instructed.**

Where the State's attorney, during the cross-examination of the accused on trial for murder, which involved the killing of third persons by the accused, said to the court: "He volunteers an explanation. Cannot I ask him something about the explanation? I happen to know something about the facts myself;" and the court replied that the witness on the stand should be permitted to testify, the remark of the State's attorney as to his knowledge of the facts, though improper, was not prejudicial to the accused; especially in view of the fact that the trial judge subsequently instructed the jury to pay no attention to the previous killing, because the accused had been acquitted thereof. (*Post, p.* 83.)

18. **SAME. Misconduct of State's attorney that was not prejudicial to accused is no ground for reversal.**

Where the jurors in a homicide case did not learn of a newspaper publication charging the creation of a corruption fund

Hughes v. State.

to bribe the jurors to insure the acquittal of the accused, the misconduct of the State's attorney in causing the publication of the charge that was found to be untrue, and his statement, not in the presence of the trial jurors, but in the presence of the venire thereafter discharged, that he had been asked if money would influence him to drop the case, constituted no ground for reversal.  (*Post, pp.* 84-86.)

19. **SAME.   Excitement produced by newspaper publication quieted by subsequent correction constitutes no ground for change of venue or continuance of case.**

The said statement of the State's attorney that he had been asked whether money would influence him to drop the case, and said newspaper publication charging the creation of a corruption fund to bribe jurors to insure an acquittal, where a subsequent publication disclosed that there was nothing in the newspaper charge, constituted no ground for change of venue or a continuance of the case, and a denial of the change of venue and a refusal of the continuance, both sought upon the ground of excitement produced by the publication of the charge, constituted no error, because properly within the discretion of the trial judge.  (*Post, pp.* 84-86.)

20. **SAME.   Removal of jurors for stating, before the jury was completed and sworn, that they had made up their minds about the case, though denied with conflicting statements, constitutes no error.**

Where a deputy sheriff, while in charge of the incomplete jury in a homicide case, heard two jurors say to each other, when they were apart from the others, and before the completion of the jury, and before they were sworn as jurors, that they had made up their minds about the matter, the trial judge properly removed said two jurors, although, on their examinations in open court, separate and apart from each other, they denied that the statements were about the case, but made such conflicting statements about their conversation as to convince the trial judge that they were talking about the case.  (*Post, pp.* 86-88.)

21. **SAME.** Assignment of error may be disregarded, where no reference to the record is made in it or the brief.

Where there is no reference to the record, either in the assignment of error or in the brief for the accused, the assignment of error complaining of the action of the trial judge in holding a juror incompetent, may be disregarded. (*Post, p. 88.*)

22. **SAME.** Court's holding venireman incompetent as juror, without tendering him to either party, is not reversible error, when.

The action of the trial judge in holding a venireman incompetent as a juror, after his examination on his *voir dire* and before he was tendered to either party, can constitute no ground for reversal, at least in the absence of an extraordinary condition. (*Post, p. 88.*)

23. **SAME.** Failure to put witnesses under the rule, where affidavit shows sufficient grounds, is error.

Where an affidavit is filed, stating sufficient grounds for the application of the rule excluding witnesses from the court room, it is the duty of the trial judge to grant it, and his failure to do so is error. (*Post, p. 89.*)

Cases cited and approved: Dougherty v. Shown, 1 Heisk., 302; Rainwater v. Elmore, 1 Heisk., 363. Other cases are cited on other points as to putting witnesses under the rule, but not upon points adjudicated in this case, on pages 89 and 90 of the opinion.

24. **SAME.** Rule excluding witnesses during trial does not include detective whose duty is to assist State's attorney in preparing cases.

The rule of court, excluding all the witnesses from the court room during the trial of a criminal case, does not include a detective attached to the office of the State's attorney, and charged with the duty of assisting in preparing cases. (*Post, pp. 88-90.*)

Case cited and approved: Car Co. v. Smith, 100 Tenn., 127.

Hughes v. State.

25. **SAME. Rule excluding witnesses during trial does not apply to rebuttal witnesses.**

The rule of court, excluding all the witnesses from the court room during the trial, civil or criminal, does not apply to witnesses in rebuttal. (*Post, p.* 90.)

Case cited and approved: Heaton v. Dennis, 103 Tenn., 161.

26. **SAME. Evidence of experiments with pistol used in the killing as to powder burns is competent.**

On a trial for murder by shooting, evidence of experiments made to show how far the pistol used by the accused in shooting the deceased would powder burn cloth similar to clothing worn by decedent is competent. (*Post, pp.* 90, 91.)

Cases cited and approved: Boyd v. State, 14 Lea, 161; Lipes v. State, 15 Lea, 125; Railroad v. Ayres, 16 Lea, 725; Byers v. Railroad, 94 Tenn., 345; Moore v. State, 96 Tenn., 209; Fisher v. Insurance Co., 124 Tenn., 450, 466-473.

27. **SAME. Same. Evidence of experiments with pistol used in the killing, as to powder burns, is properly received in rebuttal, when.**

Where, on a trial for murder by shooting, the State showed the infliction of several bullet wounds and powder stains on the shirt worn by the decedent, and the accused testified that there was a struggle between him and the decedent, and that he obtained his pistol, which was discharged, inflicting the fatal wounds, the testimony of an expert as to experiments made for the purpose of showing how far the pistol used in the killing would powder burn cloth similar to the shirt which the accused wore, was properly received in rebuttal. (*Post, pp.* 58, 90, 91.)

28. **SAME. Verdict cannot be impeached by juror's affidavit of arguments made by other jurors.**

The affidavit of a juror in a homicide case, stating the argument alleged to have been made to him by the other jurors, during their deliberations upon the verdict, resulting in the finding of the accused guilty of murder in the first degree with mitigating circumstances, is inadmissible. (*Post, pp.* 91, 94.)

126 Tenn.—4

Hughes v. State.

Case cited and approved: Lee v. State, 121 Tenn., 521, 555.

29. **SAME. Same. Juror's affidavit impeaching verdict, with subsequent affidavits of himself and foreman of jury destroying its effect, is no ground for new trial.**

Where the affidavit of a juror in a murder case, resulting in a conviction of murder in the first degree, with mitigating circumstances, averred that the other jurors argued in support of a conviction upon the grounds that the accused was a rich man, and had killed a number of men, and had gone unpunished, and that, unless a verdict of murder in the first degree was rendered, he would be given bail, and eventually go unpunished for the killing of the deceased, and that the accused was an old man, and would not live twenty years in prison, and that, if the offense was not murder in the first degree, a certain judge, upon a *habeas corpus* proceeding before him, would have released the accused on bail, and subsequent affidavits by him and by the foreman of the jury averred that the deliberations were fair and impartial, and were arrived at fairly, a new trial, upon the ground of misconduct of jurors, was properly denied. (*Post*, pp. 91-94.)

FROM SHELBY.

Appeal from the Criminal Court of Shelby County.— JESSE EDGINGTON, Judge.

M. R. PATTERSON, RALPH DAVIS, R. H. PRESCOTT, BLUFORD RICHARDS, and BROOKS NORFLEET, for Hughes.

ATTORNEY-GENERAL CATES and Z. N. ESTES, for State.

MR. JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error was indicted in the criminal court of Shelby county on a charge of having committed murder in the first degree upon the body of one Tommy Dolan, was found guilty of the crime charged, with mitigating circumstances, and sentenced to a term of life imprisonment in the state penitentiary. He has appealed to this court, and assigned numerous errors.

The first assignment is that the verdict is not supported by the evidence.

On Friday night, July 7, 1911, plaintiff in error and Tommy Dolan met in the saloon of Albert Mancini, on Madison street, in the city of Memphis. They had had no previous acquaintance. Plaintiff in error was a banker, merchant, and farmer, whose home was in Haynes, Ark., but his family had been living for a year or two at the Graham Flats in Memphis, and he was over on a visit to them. Tommy Dolan had been, at one time, a jockey, subsequently a barkeeper, and then a stage carpenter. At the time in question, however, he was not engaged in any business; the Orpheum Theatre, at which he had been employed, having been closed for the summer. These two men drank together, and, being well pleased with each other, decided to go upon a round of visits to the houses of prostitution in the city. Plaintiff in error secured a carriage driven by one Buster Davis, a colored man. Under the direction of Dolan he drove to various houses of the kind referred to, but we need not detail the orgies through which they passed. Suffice it to say that they were out all night, and did not separate until the next morning about five o'clock.

At that time the hackman told them that it was not safe
to drive around any longer. Thereupon Dolan, who
in the meantime had gone to sleep in the carriage,
waked up, and, on learning the situation, decided to
go home and go to his room and sleep. Plaintiff in
error went to Gaston's Hotel to get a shave, and waited
until the barber shop was open. While he was being
shaved by one of the barbers, the latter, who knew him
well, observed that the diamond pin which plaintiff in
error was accustomed to wear in his tie was missing,
and called his attention to it. This was a pin worth
about $400. About ten o'clock plaintiff in error went
to the store of John Vance & Company for the purpose
of seeking the assistance of Mr. Vance in the recovery
of the diamond. Mr. Vance called in Capt. O'Haver, for
some time the chief of police of the city of Memphis,
but then the head of a detective agency. Capt. O'Haver
says that when he came the plaintiff in error was so
much under the influence of drink he could not get any
clear statement of facts out of him. Mr. Vance says,
also, that he was a good deal intoxicated at that time,
but that he understood from him that he had lost his
diamond pin, and that he said several times, "Jimmie
—diamond—Jimmie—shoot him." Capt. O'Haver, hear-
ing this, surmised that he referred to Jimmie Foppiana,
who was a barkeeper at the Mancini saloon. He there-
upon went around to the saloon and interviewed Jim-
mie, and learned from him that plaintiff in error had
been out the night before with Tommy Dolan. "Jim-
mie" told Capt. O'Haver that, if he had been out with

Tommy Dolan, the diamond would turn up all right. Before Capt. O'Haver left the neighborhood of the saloon, Tommy Dolan walked up wearing a diamond pin in his tie. Mr. Hottum, who was present, asked him where he got it. He replied that the diamond was not his, but belonged to Mr. Hughes. Capt. O'Haver said that Hughes thought his diamond had been stolen. Tommy replied that it had been stolen, but that he did not steal it. He was then advised by Capt. O'Haver to leave the pin with Hottum, or with Mancini, so that Hughes could get it, as he was a bad man with a gun, and he might hurt him if he found him with the diamond. Dolan replied that if he could get close to him he was not afraid of Hughes hurting him with a pistol.

Dolan was a small man, weighing about 145 pounds; but he was very strong and very active, and a noted fighter with his fists. He was considered the best man in Memphis physically, for his size and weight. He was thirty-five years old. Plaintiff in error was fifty-three years old, and a little shorter than Dolan, and perhaps a little heavier. His left arm was partially paralyzed.

Plaintiff in error testifies that he went out again that night with Dolan, making the round of houses of ill repute, but says that he does not remember very much that happened, because he was under the influence of drink, and thinks that he had been doped. No one else testifies as to his being with Dolan Saturday night. There is a witness who testified to having seen him alone in a saloon known as the "Hole in the Wall," about

ten o'clock Saturday night, and that he was so annoy-
ing to every one present the proprietor had to shut up
the saloon to get rid of him, or that he pretended to shut
it up, putting out the lights and ordering everybody
out. However, after plaintiff in error was safely down
the street, the saloon was reopened. Plaintiff in error
says that he saw the diamond on Dolan that night, but,
not desiring to embarrass him, waited for him to return
it. He says that he reached the Cordova Hotel about
seven o'clock Sunday morning on foot. He does not
know where he came from, or how he got there, except
that he walked. He was given room No. 27. He soon
availed himself of the services of some of the employees
of the hotel to give him a rub-down with ice water.
This was repeated three or four times during the morn-
ing, and he finally slept several hours.

About half past four Tommy Dolan called on him
wearing the pin in his tie, as before stated. This was
Sunday, July 9, 1911. A bell boy of the hotel, William
Works, testifies that he carried them ice water several
times during the afternoon, and saw no evidence of
unfriendliness between them. He states one or two
facts that illustrate the situation at that time. He says
that plaintiff in error wrote a note to his wife, asking
her to meet him at the train that evening. This note
was handed by plaintiff in error to Dolan who read it
aloud. We infer that it was handed to Dolan, because
plaintiff in error was uncertain of his handwriting af-
ter the experiences through which he had been, and
wanted to see if the writing could be read. Another

fact he states is that plaintiff in error spoke of getting a small check cashed which he wished to use in paying the servants of the hotel that had waited on him. Dolan said there was not need of that—that they (meaning plaintiff in error and himself) would attend to that when they went downstairs. This was assented to by plaintiff in error; at least, he said nothing more in reference to the check. A man who was in an adjoining room testifies that during the afternoon, perhaps half an hour or an hour before the homicide, he heard laughter in the room, and something was said about taking a drink. Plaintiff in error says that he had a bottle of cocktail in his grip, and that Dolan took two or three drinks out of this. Works says that they both had their coats off. This witness also testifies that plaintiff in error ordered dinner for the two, which he brought in on a tray and placed on a table; that when they had finished their meal they ordered up drinks— a lemonade and creme de menthe. The bell boy then left them for the purpose of going to a neighboring restaurant to have an order filled for a meal for a lady in the hotel; the hotel not furnishing meals. He was gone, he says, only about twenty-five minutes. During that interval the homicide occurred.

Plaintiff in error's account of the matter is that after the meal was over he and Dolan turned to the bow window looking out on Third street; that Dolan was flirting with some girls going by, and finally succeeded in getting two to answer his signal; that he told plain-

tiff in error he could get these girls to come up to the room; that he (plaintiff in error) replied he did not want them to come, that they looked like they were "church people," and, besides that it would not be treating the hotel right; and, moreover, they had had an outing, and a good one, and he desired no more for the present. He further testified that he then said, in substance, to Dolan, "give me my diamond, and I will go home, and we can have another outing some other time;" that he had not previously mentioned the diamond to Dolan, because he was waiting for the latter to hand the stone to him of his own accord, but Dolan still kept it in his tie, without saying anything about it. Plaintiff in error says that, when he called on Dolan for the diamond in the manner just stated, Dolan replied that he would not give it to him unless he gave him fifty dollars for finding it; that he (plaintiff in error) replied that he would not give him this, because he had incurred that much expense in having Capt. O'Haver trace the diamond to him (Dolan); that Dolan thereupon flew into a rage, said that plaintiff in error could not leave the room alive without paying him fifty dollars and seized plaintiff in error by the collar, and a scuffle ensued between them; that knowing Dolan was a very much more powerful man than he physically, and that he would have small chance with him in such an encounter, he tried to get his pistol out of his hand satchel, which he says was then on the table, on which rested the dining room service which accompanied the meal; that he (plaintiff in error) succeeded in getting

the pistol by the handle, but that Dolan got it by the barrel; that somehow in the struggle the pistol went off and then Dolan relinquished it, picked up a chair, and said he would run plaintiff in error out of the room with it, at the same time using a vile epithet; that he then fired again, and continued to fire until he was satisfied. He says that he then went to the telephone in the room and called the clerk in the hotel, telling him that he had shot a man, and to call the police headquarters, and that he was standing at the door when the police came and arrested him.

When the police came in, Dolan's body was found lying on the floor with his head under the bed. The body was lying with the head to the west, or to the southwest, and the feet to the northeast. One of the policemen said: "He is still breathing." Thereupon plaintiff in error said: "I have still two loads in my pistol; give it to me, and I will finish him"—or words to that effect. Plaintiff in error denies this, but the State's proof is overwhelmingly against him. Plaintiff in error was also asked why he shot Dolan, and replied, because the latter had stolen his diamond. He then made no claim of a struggle, or any attempt on the part of Dolan to do him violence.

The services of an undertaker were employed, and the body was taken to his establishment. There a careful investigation of the wounds on the body was made. One bullet entered the back of the neck, just above the collar button, and came out just below the point of the left jaw bone, making a jagged, ugly wound.

There was another hole through his right arm, entering from the back of the arm, as shown by powder stains on the back of the sleeve of the shirt. There were two wounds in the left beast, one bullet entering just at the top of the pocket of the summer shirt Dolan was wearing, and the other about the middle of the pocket; one of them apparently right over the heart, judging from the location of the pocket. One of the balls entering the breast passed through the body, coming out under the right shoulder blade. The other bullet did not pass through. The weapon used was a 45 Colt's revolver, single action. Three of the balls were recovered. One was found in the casing of the window; another was found embedded in the floor, where the body lay; and another was found on the carpet, into which it passed, but did not penetrate the floor, making a dent only, and rebounding. This was also found near where the body lay. This latter ball was picked up about the time the body was removed, and was handed to one of the policemen.

It is now necessary to state the situation of the room and the location of the furniture. The window of the room looked out east on Third street. The door was on the western side of the room. There was a dresser near the northwestern corner of the room. The bed stood in the southwestern corner, the head up against the south wall. The table on which the dining service rested was a few feet from the window. On the north side of this table was the chair of the plaintiff in error, and on the south side the chair occupied by Dolan.

When the parties to the tragedy were last seen by the bell boy, Works, they were occupying the chairs located in the manner stated; that of plaintiff in error facing the table, and that of Dolan facing the window, and about two and one half feet from the bed. The hand satchel was on the dresser. Immediately after the tragedy the chairs and table were found in the same position, showing no evidence of a struggle. Just in front of the chair in which Dolan sat was a large pool of blood. It is clear that this blood came from the wound in the neck. That ball shattered the spine, and must have caused an immediate collapse, throwing the upper part of the body forward, and allowing the blood to drain from the wound down to the floor. This is manifest, not only from the position of the chair, but also from the fact that the back of Dolan's shirt shows no sign of blood stain, and there is only a slight stain of blood on the collar. If the body had remained upright, there would have been blood on the shirt, and on the back of the collar; but, having dropped forward, there was a drain from the wound to the floor. The ball that passed through the neck was found in the window casing, entering at an angle corresponding to the angle which the ball had taken in passing through the neck. There can be no doubt that Dolan was shot from the rear when that ball was delivered to him. Plaintiff in error is unable to account for the location of this wound, except he suggests that it may have been received by Dolan as he was leaning forward to pick up a chair to strike him with; but this is im-

possible, because he could never have picked up a chair after receiving that shot, and could never have spoken and told the plaintiff in error that he would drive him out of the room with the chair. Moreover, if he had been leaning forward when the shot was delivered, the range would have been up the neck instead of down the neck.

The evidence does not show how the body came to the floor with the head under the edge of the bed. In order to understand this, it will be necessary to now advert to the interval that elapsed between the shots that were fired.

A considerable interval elapsed between the first and second shots; another considerable interval, though less than the first, between the second and third shots; while the third and fourth shots were close together. This can be best understood by quoting from the testimony of Dr. Longinotti, the proprietor of the hotel, and that of N. O. Stovall, the clerk at the hotel.

Mr. Stovall said:

"Q. About what time did the supper go up, if you remember? A. About five-thirty. Q. I will ask you what you next heard from the room, or at the time, if anything? A. Well, about six o'clock, or a little before, Mr. Hughes called down and asked me to send his bill up. Q. Six, or a little before, Hughes called down and asked you to send his bill up? A. He said that he thought he was going away that evening. Then about six-thirty or six-forty I heard what I thought was an auto tire at first; then about a minute and a half after

that I heard another shot, and then the telephone bell rang, and I answered it, and he said: 'Send a sergeant, or a captain, or some one up to the room.' I turned and telephoned to a police station, called the number, and told them to send some one to the hotel right away. About that time I heard two more shots. Q. At that time you heard two other shots? What room was calling you by the 'phone? A. Room No. 27. Q. Hughes' room? A. Yes, sir. Q. Did you recognize his voice at the 'phone? A. It seemed the same as the calls I had had before during the day. Q. And you heard one shot, and in a minute and a half you say you heard another shot? A. Yes, sir; then the telephone rang. Q. Then the telephone rang. Then you telephoned. After you got his message to send a sergeant, you telephoned over to the police station and told them, and while telephoning, or after you had finished telephoning, you heard the other shots? A. About the time I had finished."

Dr. Longinotti testified that he was occupying room No. 24 that afternoon, and had just taken a bath. He continued: "I had a bath and stayed there. I was undressed, and I came out and commenced dressing and while I was half dressed I heard the first explosion, which I supposed was a tire, of course, and I walked to the window, and looked up and down the street to see what auto it was, and where it was, and I didn't see any commotion, and I didn't hear any car out there, and I turned back in the room, commenced dressing, and about that time there was another explosion, and then I went again to the window and looked out, because it

seemed to me a little unusual that two tires should explode that way, one after the other, and I didn't see any commotion. Then I walked back in the room and started dressing, and I heard the third shot, and then the fourth shot." He says that the fourth shot was directly after the third.

Practically all the witnesses agree that there was a very distinct interval between the first and second shots; but defendant's witnesses say the second, third, and fourth shots came quite close together. However, the weight of the evidence is in favor of the testimony of the two witnesses we have quoted.

It is clear from the testimony of Mr. Stovall that plaintiff in error had already shot Dolan twice before he telephoned, because only four shots were fired in all, and two of these were heard after he had telephoned. The last two shots, we think, were fired after Dolan's body reached the floor. The testimony shows, as we have already stated, that one of the balls was imbedded in the floor where the body lay, and was subsequently dug out, and shown in the evidence. The other ball that entered the breast did not pass through the body. After these shots were fired into Dolan's breast, he could not have gotten upon the chair. Therefore we think it very manifest that the first shot fired was that which struck Dolan in the back of the neck and shattered his spine. After collapsing, and bleeding upon the floor in front of the chair, as we have already stated, he could only have gotten out of the chair by falling from it, or being pushed from it by plaintiff in error. The evi-

dence does not show how this was. At all events, he was found on the floor, with a shot through the back of his arm, one through the back of the neck, and two shots in his breast. We have stated our opinion as to how and when the shots through the neck and into the breast were fired. It is difficult, and perhaps not material, to determine how the shot was fired through the arm. That it was fired from the rear is certain, because the powder stains on the back of the shirt sleeve show this. That it was fired at a considerable angle is also clear, because the exit of the ball, as shown by the shirt sleeve, was several inches higher up than the entrance. It was probably the second shot, following the long interval after the shot in the neck, the first shot, and was fired as Dolan lay prone upon his face. This ball, striking the floor at a wide angle, after having made a long gash in the carpet and paper under it, rebounded, making only a deep dent in the floor, without penetrating the wood, and then fell upon the floor. After these two shots had been fired, that in the neck and that in the arm, plaintiff in error stopped and telephoned to the clerk, and then came back and turned Dolan over on his back and fired two shots in his breast, for the purpose of making it appear that there had been a real conflict.

Plaintiff in error is unable to explain the shots in the breast in connection with the bullets found in the floor and the shot in the back of the arm. He meets these statements by the flat denial that he shot Dolan in the back, or that he shot him after he was down on the floor. He says the whole thing occurred in excitement, and he

is unable to say how the shots were delivered; that he felt that he was in great danger, and fired as rapidly as he could, firing all of the shots while Dolan was still on his feet. The weight of the evidence is, however, irreconcilable with this view. He denies that there was any longer interval between the shots than necessarily arose from the cocking of the pistol. The great weight of the evidence is against this view also.

Plaintiff in error says that there was a struggle. He is supported in this by the testimony of an old friend and schoolmate, who says that he saw him very soon afterwards, while the policemen were taking him to the station, and that plaintiff in error's collar was torn half off, and by the testimony of plaintiff in error's son, who says that he saw his father the next day, and that his neck and face were bruised and scratched. Several witnesses, however, on the part of the State, testified that he had no bruises or scratches, and that his collar was not torn. In addition, several testified that the room showed no signs of a struggle. Moreover, it is difficult to believe that plaintiff in error, with one partially paralyzed arm, at fifty-three years of age, could have succeeded in releasing the pistol from the grasp of a young man of thirty-five, who was very athletic, very active, and a practiced contestant in physical encounters. It is certain that, if there had been such a struggle, the table, with its tray of dishes, and the chairs, would have given evidence of it. The great weight of the evidence is in favor of the contention of the State on this subject.

After examining all of the testimony, we cannot doubt that the State's theory of the occurrence is true; that plaintiff in error, who was a man of high and imperious temper, especially when drinking, and rendered probably more irascible than ever by the excesses of the two previous nights, became enraged when Dolan demanded of him fifty dollars before he would surrender the diamond, when he thought that Dolan had really stolen it; and that, knowing he was no match for Dolan in a physical encounter, with his bare hands, and fearing that if Dolan were apprised of his purpose, although he was unarmed, he would frustrate it by his superior strength and agility, he stepped back to the dresser, took the pistol from the hand bag, shot Dolan in the back of the neck, then subsequently shot him on the floor in the manner already stated. The facts proven will admit of no other solution.

If in any view our conclusions are wrong as to the manner in which all of the shots were fired into the body of Dolan, it is at least certain that one of them was fired into the back of his neck, either when he was standing with his back to plaintiff in error, or when he was sitting in a chair with his back to him, and that another shot was fired into Dolan's breast as he lay upon his back on the floor. Either of these would sustain the verdict, as each was a mortal wound.

The jury, therefore, were well warranted in finding the plaintiff in error guilty of murder in the first degree. We do not know on what they based the finding of mitigation, unless on the age of the plaintiff in error

and the necessarily overwrought condition of his nerves, resulting from a day and two nights of debauchery, or it may be they were not willing to condemn a man to death on circumstantial evidence alone.

The second assignment of error is as follows: "The court erred in admitting photographs of the scene in the room where the killing occurred at the Cordova Hotel, including the furniture as arranged by the negro witness, Works, which photographs were used as an ocular demonstration before the jury of the exact situation at the time of the alleged killing. These photographs were two in number—one representing the chairs, table, and bed and their relative positions at the time the negro Works last saw these articles of furniture when he served supper to Hughes and Dolan, and that also showed the figure of a man, not Dolan, lying on the floor with his head under the edge of the bed; and the other photograph showed the figure of a man, representing Dolan, sitting in a chair by a table next to the bed, with a cross-mark on the back of his neck at the center of which it is claimed by the State a bullet entered, and another cross was shown in the photograph on the framework of the window, where it is alleged and presumed that the shot which passed through Dolan's neck found lodgment.

"These photographs were taken long after the homicide, and are based solely upon the memory of the witness Works, who was not present at the killing, but who proposed to give the exact positions of the deceased and defendant a half hour before the killing occurred;

there being no proof whatever in the record that these positions were not changed. It is reasonable to suppose they were, and unreasonable to suppose they were not, and the purpose of these reproductions was to prove a theory which the State had constructed as to the manner of the killing. They were used to supply proof, and could not be otherwise than prejudicial to the defendant."

The first photograph referred to in the foregoing assignment is known in the record as Exhibit A. This shows the room, bed, table, chairs, and the position of Dolan's body on the floor. It was proven to be a correct representation of these objects by William Works, an employee of the hotel, who was familiar with the room, and saw the location of the table, chairs, and other furniture about half an hour before the homicide, and saw them immediately after, and testified they were unchanged, and he also saw the position of the body on the floor. He was corroborated by other witnesses as to the location of the body; likewise as to the location of the objects of furniture immediately after the homicide. In brief, Works testified that he knew the position of the various objects referred to, and that the photograph reported them correctly. This was sufficient for the admission of the photograph in evidence. The fact that the photograph was not taken until some time had elapsed after the homicide was not a circumstance of sufficient weight to exclude it. It was introduced only for the purpose of showing the witness' recollection of the position of the objects mentioned at the time

of the tragedy, and to aid the jury in seeing these objects as the witness saw them. He testified, in effect, that the picture caught by the photographic lens truly represented the picture left upon his memory by his perception of the objects at the time and as he arranged them to give a true, visual reproduction of the impression or imprint left upon his mind by the facts. The truth of his statement as to the correct placing of the objects to be photographed was a matter for the consideration of the jury. The jury were also entitled to weigh his statement as to whether the photograph was a true representation of the objects as he had arranged them. In short, it was in the province of the jury to weigh and value all of his testimony, including the photograph, treating that as a part of his testimony.

The fact that the photograph was not proven by the photographer who made it was immaterial. *McGirr Sons & Co.* v. *Babbitt,* 61 Misc. Rep., 291, 113 N. Y. Supp., 753; *Smith* v. *Central Vermont Ry. Co.,* 80 Vt. 208, 67 Atl., 535; *McKarren* v. *Boston & N. St. Ry. Co.,* 194 Mass., 179, 80 N. E., 477, 10 Ann. Cas., 961, and note; *Consolidated Gas, Electric Light & Power Co.* v. *State,* 109 Md., 186, 72 Atl., 651; *Indiana Union Traction Co.* v. *Scribner* (Ind. App.), 93 N. E., 1014. The accuracy of photographs may be proven by any one who knows the fact. *Thompson* v. *Galveston H. & S. A. Ry. Co.,* 48 Tex. Civ. App., 284, 106 S. W., 910; *Consolidated Gas, Electric Light & Power Co.* v. *State,* supra. They are admissible in evidence when shown to be reasonably accurate representation of the place or thing in ques-

tion, to help the jury in understanding the testimony of the witnesses. *Union Traction Co.* v. *Scribner,* supra; *Hassam* v. *Safford,* 82 Vt., 444, 74 Atl., 197. They belong in the law of evidence to the same class as models, maps, and plans. It does not affect the admissibility of such a representation, if it be shown that it is incorrect in some particulars, but only its weight. *Territory* v. *Price,* 14 N. M., 262, 91 Pac., 733. The purpose of the introduction of such pictorial representations is, as stated, to enable the jury to understand the evidence in relation to the objects or things as presented. *West* v. *State,* 53 Fla., 77, 43 South., 445; *Martin* v. *Knight,* 147 N. C., 564, 61 S. E., 447; *Kansas City So. Ry. Co.* v. *Morris,* 80 Ark., 528, 98 S. W., 363, 10 Ann. Cas., 618; *Johnson* v. *Union Pac. R. Co.,* 35 Utah, 285, 100 Pac., 390; *State* v. *Hersom,* 90 Me., 273, 38 Atl., 160. The admissibility of such representations is not affected by the fact that they were made at the instance of the prosecuting attorney for the State, to illustrate his theory of the case (*State* v. *Remington,* 50 Or., 99, 91 Pac., 473; *Burton* v. *State,* 115 Ala., 1, 22 South., 585; *Jarvis* v. *State,* 138 Ala., 17, 34 South., 1025); nor by the fact that the witnesses for the opposite side of the controversy deny their correctness (*Moon* v. *State,* 68 Ga., 687.)

We are referred by counsel for plaintiff in error to the case of *Fore* v. *State,* 75 Miss., 727, 23 South., 710, as holding in effect that the use made of the photographs in the present case was not allowable. If such be the proper construction of that case, it is opposed by the

weight of authority. In *Shaw* v. *State*, 83 Ga., 92, 9 S. E., 768, a photograph of the locality where the deceased was killed, taken with persons placed where defendant and his accomplices were said to have stood, was held competent. In *State* v. *O'Reilly*, 126 Mo., 597, 29 S. W., 577, it was held that a photograph was competent which represented the scene of the crime, with persons placed where defendant, deceased, and another person were said to have stood. In *State* v. *Kelly*, 46 S. C., 55, 24 S. E., 60, a case wherein a defendant was on trial for an assault with intent to kill, it was held competent to exhibit a photograph representing the window through which the person assaulted was shot, with that person occupying the position he was in at the time of the shooting. In *People* v. *Mahatch*, 148 Cal., 200, 82 Pac., 779, on a trial for homicide, it was held that photographs showing the condition of things in the vicinity where the body of deceased was found, and disclosing the presence of objects correctly placed on the ground by witnesses to indicate where deceased's body, the knife, hat, and coat of defendant, and the hat of deceased were located when the scene of the homicide was first visited, were, admissible. To the same effect are *Sellers* v. *State*, 91 Ark., 175, 120 S. W., 840; s c., 91 Ark., 313, 124 S. W., 770; *City of Spokane* v. *Patterson*, 46 Wash., 93, 89 Pac., 402, 8 L. R. A. (N. S.), 1104, 123 Am. St. Rep., 921, 13 Ann. Cas., 706; *Britt* v. *Carolina Northern R. Co.*, 148 N. C., 37, 61 S. E., 601; *Harrison* v. *Green*, 157 Mich., 690, 122 N. W., 205; *Bowling*

*Green Gaslight Co.* v. *Dean's Executor,* 142 Ky., 678, 134 S. W., 1115.

And on the general subject see *Carlson* v. *Benton,* 66 Neb., 486, 92 N. W., 600, 1 Ann. Cas., 159, and note; *State* v. *Matheson,* 130 Iowa, 440, 103 N. W., 137, 114 Am. St. Rep., 427, 8 Ann. Cas., 430; *Higgs* v. *Minn., etc. R. Co.,* 16 N. D., 446, 114 N. W., 722, 15 Ann. Cas., 97, and note, 15 L. R. A. (N. S.), 1162, and note; *Dederichs* v. *Salt Lake City R. Co.,* 14 Utah, 137, 46 Pac., 656, 35 L. R. A., 802, and note.

It is conceded in the assignment of error that the photograph Exhibit B, the second one mentioned in the assignment, was likewise taken under an arrangement of objects in the room made by the witness Works, according to his memory, as in the case of the photograph Exhibit A, and the same observations made with regard to Exhibit A apply to this photograph. The statement in the assignment to the effect that there was no proof that the positions of the objects were not changed is incorrect, since the witness Condon testified that the picture showed the objects correctly when he arrived there immediately after the homicide, and Works testified that when he returned, which was also immediately after the homicide, the objects in the room were unchanged in their position.

This assignment is not well taken and is overruled.

The third assignment was as follows:

"It was error in the court to permit, over the objection of the defendant, in the presence of the jury,

during the testimony of the surveyor Richardson, the assembling and arranging of the furniture, said to have come from room 27 of the Cordova Hotel, including the carpet, table and chairs, together with an alleged reproduction of the window, so that the witness might testify as to the placement of these articles of furniture which had been assembled in the presence of the jury, and thus deliver his testimony to the jury. If this evidence was competent at all, which we deny, it was competent as original evidence, and not in rebuttal.

"This proof permitted the attorney-general to construct his theory of the case, based upon the arrangement of the furniture in the room, the position of the body in the chair and on the floor, in alleged rebuttal, over the objection of the defendant, when there was nothing in the testimony to make this proof in any sense rebuttal. But the scene thus laid before the jury was incompetent for any purpose, and utterly unknown to legal procedure. It was misleading in its tendency, and highly prejudicial in this particular case; for the arrangement of the furniture was made by the witness Works, who confessedly was not present at the time of the homicide. It was used, as were the photographs, to supply the absence of proof, and show the conditions at the time of the homicide, which were not testified to by any witness in the record."

This assignment must also be overruled. Evidence of the kind referred to is perfectly competent, and its introduction is supported by the same reasons which justify the admission of photographs. We know of no

case in which this kind of evidence was used quite so extensively as in the one now before the court; but there are a sufficient number of precedents to show that the evidence is not incompetent, and to illustrate its use. It is a matter of familiar practice to introduce weapons used as a means of committing crime, and blood-stained garments. Objects of that kind were introduced in the present case without objection. It has been held that the skull of the deceased may be produced before the jury, showing a bullet hole, for the purpose of determining the relative positions of the deceased and the defendant at the time the shot was fired, in connection with the testimony of a surgeon as to certain physical evidences tending to show from what relative position the shot was fired (*Thrawley* v. *State,* 153 Ind., 375, 55 N. E., 95) ; a dressmaker's frame, for convenience in exhibiting the clothing of a murdered woman, which was introduced in evidence (*People* v. *Durrant,* 116 Cal., 179, 48 Pac., 75) ; the blood-stained bedclothes, which were found in deceased's room at the time of her death, when properly identified (*Painter* v. *People,* 147 Ill., 444, 35 N. E., 64) ; a piece of board cut from the floor of a house, in which it was alleged a homicide had been committed, for the purpose of showing blood stains thereon (*State* v. *Martin,* 47 S. C., 67, 25 S. E., 113) ; a trunk found in deceased's bed-room, where he was killed, and its contents (*State* v. *Coella,* 8 Wash., 512, 36 Pac., 474) ; various articles, such as burglars' tools, and part of a newspaper found in a room occupied by the accused, before the murder, and at the scene of the crime,

and the possession of which was connected with the prisoner or his accomplices, and shoes found at the place where the murder was committed, fitting the prisoner (*Ruloff* v. *People,* 45 N. Y., 213) ; impressions or casts of the prisoner's shoes in a box of moist sand (*People* v. *Scarcey,* 121 Cal., 1, 53 Pac., 359, 41 L. R. A., 157; *Johnson* v. *State,* 59 N. J. Law, 535, 37 Atl., 949, 39 Atl., 646, 38 L. R. A., 373). And in *People* v. *Maughs,* 149 Cal., 253, 86 Pac., 187, on a trial for homicide, it appeared that in the court below a structure built as nearly as might be in duplicate of a porch on which decedent was standing when he was shot was erected in the court room, visible to the jury during its impanelment, and afterwards admitted in evidence. This was held to be prejudicial to the accused. To the same effect is a report of the same case two years later in 8 Cal. App., 107, 96 Pac., 407. This kind of evidence is, of course, largely in the discretion of the trial judge, who may in a proper case refuse to permit his court room to be littered with cumbrous structures that should be represented by maps, diagrams, or photographs.

It is stated in the assignment that the evidence in question was not properly in rebuttal, but was original evidence. While the testimony might have been introduced as original evidence, it was not imperative that the State should take this course. It was equally applicable as rebuttal evidence, since it had a distinct tendency to overturn the defense offered by the plaintiff in error. Moreover, as said in *Moore* v. *State,* 96

Tenn., 209, 33 S. W., 1046; "While orderly procedure would suggest that the State should put its whole case in evidence in chief, and reserve only its rebuttal testimony to meet the case of the prisoner, yet there is no fixed or inflexible rule which would require the trial judge to reject testimony in rebuttal which more properly should have been presented in the opening of the case. This is a matter resting in the sound discretion of the court below, and unless the case should disclose an abuse of that discretion, it would not be interfered with by this court."

The fourth assignment of error is based upon the action of the trial judge in permitting the attorney for the State to recall plaintiff in error before the jury after the defense had closed and the State was engaged in the introduction of its rebuttal evidence, and ask him the following question: "Mr. Hughes, at the station house, after this shooting, didn't you tell Sergeant Lary Long of the police department, about between eight and nine o'clock, on Sunday, the 9th day of July, that Tommy Dolan had not stolen your diamond, but that a woman had, and Tommy had gotten it back from her?" To this question plaintiff in error replied: "No, sir; I never said such a thing to any one. I always believed that Dolan got my diamond, and I never said anything else to any one." The State then put Lary Long upon the witness stand, and he testified that the plaintiff in error did make that statement to him at the time and place mentioned in the question. It is objected that the trial judge abused his discretion in permitting the

plaintiff in error to be recalled for the purpose of contradicting him in the manner stated, and also that the testimony of Long was matter in chief, and hence not properly introduced in rebuttal.

As conceded by counsel for the plaintiff in error in the court below, this was a matter entirely within the discretion of the trial judge. We cannot say that it was an abuse of his discretion. Certainly it was not necessary to recall the plaintiff in error, as a basis for asking Long about this matter, because plaintiff in error had already testified, in effect, that he believed that Dolan had stolen his diamond, and if the question was material as to whether he believed that Dolan had stolen it, or had subsequently got it from a girl who had stolen it, the basis already existed in the evidence for asking Long the question. That is to say, the State, without putting plaintiff in error back upon the stand, might have gone into the question, and have contradicted the plaintiff in error, because he was not only a witness, but a party. He could not justly complain if the State gave him the opportunity of saying whether or not he had made such statement. No question is made as to the competency of the evidence. Treating it as competent and material, it was certainly matter in rebuttal, not in chief, as complained by counsel for plaintiff in error.

The fifth assignment of error presents two points.

The first one is that the court committed error in refusing to permit the plaintiff in error to recall the witness Stovall, the clerk of the hotel, who had been examined by the State when putting its original case. What

the plaintiff in error desired to prove by Stovall on this recall was that when he entered room No. 27, immediately after the shooting, at the time the policemen went into the room, he did not hear the plaintiff in error say that he had two shots left in his pistol, and if Dolan was not yet dead he would kill him, or finish him, or words to that effect, with these shots. The court caused the jury to retire and allowed plaintiff in error to introduce Mr. Stovall, who made the statement just mentioned; but the court refused to allow him to make the statement before the jury. There was no error in this. The subject referred to had been gone into, in substance, fully in the testimony of the policeman Soefker, who was introduced by the State when it was putting its original evidence before the jury. Soefker was examined before Mr. Stovall was, and plaintiff in error had full opportunity to ask Stovall about the matter when his counsel cross-examined him, or to recall him when the plaintiff in error was putting his defense before the jury. The trial judge might have permitted the witness to be introduced after the State had closed its evidence in rebuttal, as asked by plaintiff in error, but was not bound to do so. The matter was within his sound discretion.

The second point under this assignment is that the trial judge committed error in refusing to permit the introduction of one Gatewood, a street car conductor, after the State had closed its evidence in rebuttal. The purpose was to prove, by this witness, that he was the conductor on a street car on which the witness A. J. Mc-

Donald was motorman, that the car was right near the hotel, that he had heard the four shots, and that there was quite an interval between the first and second shots, but only a brief interval between the second, third, and fourth; these three last shots being fired in quick succession, with only slight intervals between each. It appears that the witness would have so testified, if permitted to do so. There must be an end of the calling of witnesses at some time. The plaintiff in error, before he closed his defense, had called and examined the motorman, A. J. McDonald, as to the number of shots and the interval between them. He, of course, knew that every street car has not only a motorman but a conductor as well, and it appears that this conductor had all the time subsequent to the homicide continued in the employ of the street car company. Many months elapsed between the homicide and the trial, and in the meantime there had been quite an extensive trial upon *habeas corpus* proceedings, for the purpose of obtaining bail. No reason appears why plaintiff in error did not ascertain what the evidence of the conductor would be when he learned that of the motorman at the time the latter was placed under subpoena.

The sixth assignment is composite, embracing three objections, rather than one.

The first point is that the court erred in permitting the attorney for the State to inquire about former homicides and assaults with intent to kill. The evidence drawn from plaintiff in error on cross-examination was that, prior to the killing of Dolan, he had killed three

Hughes v. State.

other men and had shot at two others. All of these occurred in the State of Arkansas, where he lived. As to one of these homicides he testified that he had been tried and acquitted. The trial judge instructed the jury that this ended the matter, and that this particular occurrence could not be considered for any purpose whatever. As to the other matters, he allowed the plaintiff in error · to fully explain his position with respect thereto, showing such exculpation as he saw proper to offer in his answers to the inquiries of the attorney for the State. The State was not allowed to introduce any evidence in respect of these matters outside or beyond the testimony of the plaintiff in error. It was proper to ask the defendant these questions on cross-examination, as they had a bearing upon his moral character, and his credit as a witness, as without doubt murder is an immoral act. The ruling of the trial court upon these matters was as follows: "The court will permit counsel to ask whether or not this defendant killed these men, and he will answer 'yes' or 'no,' and he may ask whether or not he was indicted, or whether or not he was convicted; but further than that the court deems it will be improper —that is, improper for the State to inquire." The court said plaintiff in error, as a witness, might be asked any questions involving his moral turpitude, "and that he may be examined along those lines by the attorney-general and where he says that he was indicted and acquitted that ends the matter. In regard to all specific acts, the State is bound by the answers of the witness. And further, he may ask as to other killings and other

affairs, and the witness may explain them, and the State is bound by his answers and explanations."

Further, the trial judge, in his charge, said to the jury in reference to this subject:

"If the proof should show other charges against this defendant, which were determined in the defendant's favor by acquittal, the jury cannot consider these for any purpose.

"If the proof should show certain charges not having proceeded to indictment, you may only consider the defendant's explanation of these as involving his moral turpitude, and not in any way as affecting his presumption of innocence in the case on trial.

"Where remote transactions are shown in the proof, and where it is shown that such transactions have long since been repented of and forgiven by the community, these transactions should not be considered by the jury' where reformation is shown. But where the inquiry relates to transactions comparatively recent, and any that may bear directly upon the present character and moral principles of the witness, you may consider with all the other proof in arriving at your verdict."

The action of the trial court in respect of these matters was well within the authority of *Zanone* v. *State,* 97 Tenn., 101, 36 S. W., 711, 35 L. R. A., 556; *Ryan* v. *State,* 97 Tenn., 206, 36 S. W., 930, and *Powers* v. *State,* 117 Tenn., 363, 369, 97 S. W., 815.

The trial judge very conservatively limited this evidence to plaintiff in error's character as a witness and as such it was only competent at the time it was intro-

Hughes v. State.

duced; but immediately after he left the stand he introduced numerous witnesses to show his good character for peace and good order in the State of Arkansas, and thereby made his general character the subject of examination, as throwing light upon his guilt or innocence. We need not consider the question whether, under such circumstances, evidence of the kind referred to, brought out on cross-examination, might have been properly used for the purposes last indicated.

It was also objected, under this assignment that the trial judge permitted the widow of Dr. Scott, one of the men whom plaintiff in error killed in Arkansas, to remain in the court room, after he had opened court, and, in the presence of the jury, characterize a statement made by Hughes as "an emphatic story," as the defendant was being cross-examined. It is insisted that, when the attention of the court was specially called to the presence of this lady in the court room, and her remark, instead of ordering her removal, his honor rather paliated and excused her presence, saying "that if she did not repeat her offense she would be allowed to sit by the attorney-general and prompt him in the asking of questions." It does not appear whether or not the jury heard the remark made by Mrs. Scott, or whether it was made loud enough for them to hear it. The trial judge said that he did not hear it. It does not appear that any one heard it, except the attorneys on the respective sides, and the stenographer. Upon the remark being made one of the counsel for the prisoner arose and excepted. There upon the court said: "The jury will not consider any

126 Tenn.—6

remark of this lady, and if she makes any more remarks she will be asked to retire. . . . The court did not hear the remark. I don't know what it was." After this the jury retired under order of the court. Thereupon the matter was further discussed in the absence of the jury, during which discussion the attorney-general stated certain questions that he wished to ask the plaintiff in error about slanders that it was claimed he had circulated about Mrs. Scott. The court then said: "Those questions would be improper. The court cannot let you go into those. This lady may remain in and assist the State's cross-examination, and make suggestions; but the court did not hear the remark she made, and I don't think she made it with the intention of its getting to the jury, but if she makes another remark she must leave the room." This remark was made, as indicated, to counsel on both sides out of the presence of the jury.

There was no error in this matter.

It is insisted that the plaintiff in error was deeply prejudiced by the mere presence of Mrs. Scott in the court room, sitting by the attorney-general. It does not appear that she was placed by the attorney-general for the purpose of influencing the jury, and in the absence of such fact it was not improper that the attorney-general should have the benefit of such suggestions as he hoped to obtain from her with respect to the life of the plaintiff in error in Arkansas, as to which he was cross-examining the plaintiff in error. In addition, it appears that plaintiff in error was tried in Arkansas and ac-

quitted for the killing of Dr. Scott, and the jury were instructed that they were to pay no attention to the evidence with respect to that homicide.

It is also objected, under this assignment, that the court erred in permitting the attorney-general to remark in the presence of the jury that he knew something of the facts of the killing of Dr. Scott. It was said that this was "a plain intimation in the presence of the jury of the guilt of Hughes of that homicide." What really happened was this: During the cross-examination of plaintiff in error, while the Scott murder was the subject of the examination, the attorney-general said to the court: "He volunteers an explanation. Cannot I ask him something about the explanation? I happen to know something about the facts myself." The court replied: "Let the witness testify that is on. the stand." This was the whole matter. While the remark made by the attorney-general in the last sentence quoted was improper, it contained no such statement as insisted by counsel for the plaintiff in error, and we cannot say that it was harmful to the plaintiff in error's case, certainly not sufficiently so to warrant a reversal, and especially in view of the fact that the trial judge subsequently instructed the jury to pay no attention to the matter at all, because he had been acquitted.

Under the same assignment of error, a motion is referred to which was made by counsel for the plaintiff in error before the case was finally submitted to the jury, under which the court was asked to withdraw all of the testimony about former homicides and assaults.

We need add nothing to what has been already said upon this subject. This evidence was competent, to the extent to which it was admitted by the trial judge.

The seventh assignment of error is in the following language:

"For misconduct on the part of the attorney-general in causing to be published in the Commercial Appeal, a daily newspaper published in the city of Memphis, Shelby county, Tennessee, the affidavit of H. G. Trobaugh, which affidavit declared that a slush fund had been created for the purpose of bribing jurors, so as to insure a favorable finding for the accused; this publication having been made when the venire was in court, from which a trial jury was being selected.

"And for additional misconduct on the part of the attorney-general in stating in open court the following: That a Front street merchant, a friend of his, had said to him that there were people over here from Arkansas, who wanted to know if he could be reached with money to drop the Hughes Case; this statement being made when the trial jury was being selected, the venire being in attendance upon the court and was published in the daily newspapers of Memphis, and given wide prominence."

The affidavit referred to was made by Mr. Trobaugh and handed to the attorney-general, and from his office passed to the newspapers of Memphis. Such publication ought not to have been made. The attorney-general stated that his ground for it was his belief that its publication would scare off intending bribe takers, if there

Hughes v. State.

were such.  However, an investigation of the matter was had before the trial judge, in the absence of the jurymen already selected, from which it developed that one of the veniremen, Howard Smith, had said, in substance, to Trobaugh that he understood that there was a fund of $15,000 put up by Hughes, or his friends, to bribe jurors, and that he (Smith) was on the venire, and was certainly going to report for service the next day. Smith was examined, and it appeared very clearly from his evidence that he knew nothing at all, and the whole thing ended in nothing.  The newspapers came out the next day and stated the result of the investigation.  It does not appear that the jurors already taken had any knowledge of the newspapers, and if they were properly kept they did not.  Nothing else appearing, we must presume that they were properly kept, and that the newspapers were excluded from them.  The remaining members of the venire were immediately discharged, and a new venire summoned, without objection by either side.  As to the matter complained of in the second paragraph of the assignment, the attorney-general stated frankly in open court that some three months before the trial, a Front street merchant, a friend of his, had made the statement referred to in the assignment just mentioned, and that he would give the name if the court desired.  The court did not express any desire to know it, nor did the counsel for plaintiff in error, and this likewise ended in nothing. There is nothing to show that this ever came to the knowledge of the selected jurors, and it could not have reached them if they were proper-

ly secluded, and we must presume they were in the absence of proof to the contrary.

It not appearing that the plaintiff in error was in any wise prejudiced by these matters in the trial of his case, this assignment must be overruled.

The eighth assignment is:

"The court erred in denying the motion of accused for change of venue or a continuance of his case to a future term of the court, which motion was predicated on the prejudice and excitement in the public mind resulting from publications of the affidavits relating to the slush fund and the declaration of the attorney-general in open court to the effect that an effort had been made to bribe him to drop the prosecution."

What has been said in disposing of the preceding assignment sufficiently covers this matter. We may add that the only evidence of any excitement produced by the newspaper articles referred to was an affidavit filed by plaintiff in error, and this was met by an affidavit of the attorney-general showing the contrary. The matter of change of venue is largely in the discretion of the trial judge, and we do not think he abused that discretion in the present instance. Whatever stir may have been caused by the publications concerning the supposed attempt at bribery, this must have been quieted by the publications of subsequent date showing that there was nothing in the matter.

The ninth assignment is:

"The court erred in removing from the jury, jurors Lawhorn, and Kelly, after said jurors had been accepted

as members of the trial jury, and in holding the juror Paine incompetent.  These jurors, Lawhorn and Kelly, had been selected by the defendant, and the record shows defendant exhausted his challenges, and was compelled to accept a juror not of his selection."

The jurors Lawhorn and Kelly were removed by the trial judge before the jury was completed, and, of course, before it was sworn.  The trial judge acted correctly in this matter.  The deputy sheriff in charge of the jury heard Lawhorn say to Kelly, when they were apart from the others, that he had made up his mind about the matter, and Kelly replied, "I have too."  The deputy sheriff cautioned them that they were acting contrary to the instructions of the trial judge, and reported the matter to him. He caused these two jurors to be examined in open court, separately and apart from each other, and out of the presence of the other jurors.  They both denied that they were talking about the case, or that they had made up their minds about it; but they made conflicting statements, and so testified as to convince the trial judge that they were talking about the case, and had said to each other that they had agreed upon how they would render their verdict.  The act of jurors in deciding a case before any evidence is heard cannot be sufficiently characterized to express its enormity.  To say that it is prompted by prejudice is to state the matter mildly.  Such conduct is indicative of either prejudice or corruption.  It is true the evidence was not clear that the jurors in question were guilty

of this reprehensible conduct; but the trial judge must be allowed much discretion in matters of this kind. Through this whole case there appears abundant evidence that his honor was actuated solely by a desire to conduct the trial in a manner fair both to the prisoner and to the State; and, particularly, in the matter now under consideration, there appears evidence of a high regard for the rights of both parties, and a singleness of purpose on his part to do justice between them.

As to the juror Paine, there is nothing further in plaintiff in error's brief, except what appears in the assignment. There is no reference to the record, and under the rules we might disregard this entirely. However, we have read what the record contains upon this subject, and find no error in the action of the trial judge. Paine was summoned as a venireman, and was examined on his *voir dire,* and held incompetent by the trial judge, and was not tendered to either party. Certainly the case would be very extraordinary that would justify a complaint about such action. Moreover, we think the trial judge acted correctly on the facts stated by the venireman.

The tenth assignment of error presents two points: First, that the court erred in allowing the witness John Exnicious to testify, inasmuch as the rule had been asked for by the parties and ordered by the court excluding all witnesses from the court room, and the witness Exnicious was present in the court room assisting the attorney-general by suggestions, also aiding him in the selection of the jury and obtaining and presenting proof;

Hughes v. State.

secondly, because the evidence of this witness was competent, if at all, only in chief, and not in rebuttal.

As to the first point. Where an affidavit is filed, stating sufficient grounds for the rule, it is the duty of the court to grant it, and his failure to do so has been held error. *Rainwater* v. *Elmore,* 1 Heisk., 363; *Dougherty* v. *Shown,* 1 Heisk., 302. Where no affidavit is made, the duty of the trial judge is not so stringent. Same authorities. It has been held that, although the rule be granted, a party to the cause who intends to be a witness need not go under it (*Heaton* v. *Dennis,* 103 Tenn., 161, 52 S. W., 175); or an attorney of the parties (*Wisener* v. *Maupin,* 2 Baxt., 342, 356-357); or one directly interested in the result (*Adolff* v. *Irby,* 110 Tenn., 222, 75 S. W., 710); or an officer of a corporation whose presence is necessary for assistance to the attorney of the latter in presenting the case (*Lenoir Car Co.* v. *Smith,* 100 Tenn., 127, 42 S. W., 879). It has been held that, where the rule has been properly granted, no reversal will be entered in this court because a witness was introduced on the trial who had not complied with the rule, except in a very extraordinary case. *Smith* v. *State,* 4 Lea, 428, 430; *Baxter* v. *State,* 15 Lea, 666; *Pile* v. *State,* 107 Tenn., 533, 64 S. W., 477; *Nelson* v. *State,* 2 Swan, 237, 258. To the same effect, see *Holder* v. *United States,* 150 U. S., 92, 14 Sup. Ct., 10, 37 L. Ed., 1010. It is a matter that goes to the credit of the witness, and likewise he may be punished for contempt. Same authorities. In addition, the rule is general that the court will not reverse on mere points

of practice unless it affirmatively appears that injury was done to the party complaining. *Jones* v. *State,* 11 Lea, 468, 470, 471; *Railroad* v. *Hunton,* 114 Tenn., 609, 624, 88 S. W., 182; *L. & N. R. R. Co.* v. *Parker,* 12 Heisk., 49. Occasionally cases have been presented where such affirmative injury was held to appear. *Watterson* v. *Watterson,* 1 Head, 1, 8, 9; *Bank* v. *Officer,* 3 Baxt., 173, 176, 177.

Mr. Exnicious was a detective attached to the office of the attorney-general of Shelby county, whose business was to assist that officer in preparing cases, and he would fall within the same exceptions which protect the officers of a corporation. However, we think his evidence was in rebuttal, and such witnesses do not go under the rule. *Heaton* v. *Dennis,* supra.

What has been said disposes of both of the points made in the assignment.

The eleventh assignment raises the objection that the evidence of the witness St. George Richardson was not competent in any view, but, if competent at all, only in chief, and not in rebuttal. This witness testified to certain experiments which he made with the pistol which was used by plaintiff in error in killing Dolan. The purpose of the experiments was to show how far the pistol would powder-burn cloth similar to the shirt which Dolan wore. Experiments were made at four, twelve and twenty inches, and so on. At a distance of four inches it was shown that the cloth would take fire; at twelve inches there would be a slight ignition, at twenty inches, thick powder specks; at twenty-six inch-

es, still powder specks, but not so thick; at thirty inches still powder specks,' very noticeable. It has been held in this State that experiments, when made under the proper test conditions, are competent evidence. *Boyd* v. *State,* 14 Lea, 161; *Lipes* v. *State,* 15 Lea, 125, 54 Am. Rep., 402; *Mississippi & Tennessee R. R. Co.* v. *Ayres,* 16 Lea, 725; *Byers* v. *Railroad,* 94 Tenn., 345, 29 S. W., 128; *Moore v. State,* 96 Tenn., 209, 33 S. W., 1046; *Fisher* v. *Insurance Co.,* 124 Tenn., 450, 466-473, 138 S. W., 316.

As to the other point, we are of the opinion that the evidence was clearly in rebuttal.

The twelfth assignment is based upon the affidavit of one of the jurors, as follows: "That the first ballot taken by the jury was to determine whether or not the accused was guilty of murder in the first degree; that this ballot resulted in a difference of opinion; that this condition continued up to Friday, March 1st, at which time the above-mentioned verdict was reported in open court; that those members of the trial jury who favored convicting the accused of murder in the first degree stated to jurors who opposed their position that the accused was a very wealthy man; that he had killed a number of men, and had gone unpunished for his criminal acts; that unless a verdict of murder in the first degree was reported the accused would be accorded bail; that in that event he would go unpunished for the killing of Tommy Dolan, as he had for the killing of his other victims; that the accused was an old man; that he would not live twenty years in prison; that by returning

a verdict of murder in the first degree, with mitigat-
ing circumstances, the punishment, by reason of ac-
cused's advanced years, would be less than that fixed
for murder in the second degree; that the accused, if he
appealed the case to the supreme court would not be
accorded bail, thus insuring some punishment for him;
that it was murder in the first degree, otherwise Judge
Galloway would have accorded the accused bail when
he sought his release through the medium of a writ of
*habeas corpus;* that he was seeking through his wealth
to defeat justice; that these statements were made by
certain members of the trial jury for the purpose of in-
ducing affiant, in particular, to vote in favor of convict-
ing the accused of murder in the first degree; that none
of these statements were testified to by a single sworn
witness in open court during the progress of the trial,
and was matter submitted alone in the jury room by
members of that body during their deliberations for the
purpose of arriving at a verdict."

The foregoing affidavit was made on the 5th day of
April, 1912. On the next day he made another affidavit,
as follows: "That before any deliberations in the case
were entered into, the foreman, Mr. Miller, suggested
each one of the jurors give an expression of his opinion
concerning the facts in the case, whereupon we debated
the facts, circumstances, and the law in the case. Two
ballots were taken before we went to the hotel, and
there was a failure to agree. Then we went to the ho-
tel. When Mr. Miller got there, as foreman of the
jury, he told us that it was our duty, under the law,

to be governed by the evidence as introduced in the court, and the law as charged by the judge, and not to be governed by any other consideration. All during the deliberations Mr. Miller, as foreman, conducted himself in a fair and impartial manner, and my verdict was not forced or compelled, but was freely and voluntarily made. I reasoned that there were eleven others considering life imprisonment as proper, and that they had the same opportunity to consider the evidence as I had, and so I then come over to the majority. I understood that life imprisonment might be more than twenty years; but, under the showing that the defendant had Bright's disease, I thought that it might not be more than twenty years. The defendant's having wealth had no influence on me one way or the other. Whether Judge Galloway had ruled one way or the other would not have controlled me in my opinion in a case in which I had heard the evidence. I fully understood the case, and all the facts in the case, and I feel that I have done my duty on the case honestly and according to my conscience." The first affidavit was procured from Cross at the instance of plaintiff in error; the second, at the instance of the State.

W. W. Miller, the foreman of the jury, referring to the second affidavit of Cross, said, in his affidavit: "I have read over the above statement made by Juror Cross, and the statements made in there in reference to what was said and took place in the jury room are substantially true. I want to add that all during the deliberations I tried to impress upon the jury that it was

the duty of each juror to decide this case according to his own independent conscience, and base his findings solely upon the law and the evidence. I wish, further, to add that during all the deliberations of the jury every man was permitted and encouraged to make a full statement of his views; and the deliberations of the jury were carried on in a legal and orderly manner, with due regard for the solemnity and importance of our duty both to the defendant and the State. The verdict was fairly arrived at, and was duly accepted and agreed to by every member of the jury, with no exception."

As to the statements contained in the first affidavit of Cross, it is proper to say that, although the wealth or poverty of the plaintiff in error was a wholly immaterial consideration, yet incidentally there was evidence upon the subject to the effect that he was a man of wealth. He gave his occupation at the police station as that of a capitalist. There was also evidence as to former homicides by plaintiff in error, brought out on his cross-examination, as stated under a previous assignment. There was also evidence of an application for bail. The first affidavit of Cross merely stated arguments which he alleged had been made to him by other jurors. Such affidavits are inadmissible. It has been so held by this court in a capital case. *Lee* v. *State,* 121 Tenn., 521, 555, 116 S. W., 881 *et seq.* In addition, the second affidavit of Cross practically emasculated the first, and the affidavit of Miller completed its destruction.

The foregoing are all of the errors assigned.

Hughes v. State.

This case began in the court below on the 2d day of January, of the present year, and terminated on March 1st. The witnesses were many, and the record is very voluminous. The contest was vigorous, and even acrimonious, but was presided over with composure and eminent fairness by the learned trial judge. It is impossible in so great a trial to exclude minor errors. That so few are shown in the present record is the result of the careful manner in which the case was conducted. We are satisfied that justice has been done the plaintiff in error, and the judgment must be affirmed.